09   CV   716

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

G. PHILIP STEPHENSON, as Trustee of the
PHILIP STEPHENSON REVOCABLE LIVING TRUST,

Plaintiff,

-against-

CITCO GROUP LIMITED;
CITCO FUND SERVICES (EUROPE) BV;
CITCO (CANADA), INC.; and
PRICEWATERHOUSECOOPERS, LLP
(an Ontario limited liability partnership),

Defendants.

------------------------------------------------------------------------x

JURY TRIAL DEMANDED

RECEIVED
JAN 2 6 2009
U.S.D.C. S.D.N.Y.
CASHIERS

# COMPLAINT

DEUTSCH, METZ & DEUTSCH, LLP
18 East 41st Street, Sixth Floor
New York, New York 10017
(212) 684-1111

TABLE OF CONTENTS

Page

OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE PARTIES AND RELEVANT ENTITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Fairfield Greenwich Entities and Persons (Non-Parties) . . . . . . . . . . . . . . . 3

    C.    The Citco Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    D.    PricewaterhouseCoopers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

FACTS COMMON TO ALL COUNTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.    The Operations of Sentry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.    The Role of Citco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    C.    The Role of PWC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    D.    Plaintiff's Investment in Sentry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    E.    Sentry is Discovered to Be Part of a Ponzi Scheme . . . . . . . . . . . . . . . . . . . 30

    F.    The Red Flags . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    G.    Citco's Failures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    H.    PWC's Failures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

COUNT I:    BREACH OF FIDUCIARY DUTY AGAINST
             THE CITCO DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

COUNT II:    GROSS NEGLIGENCE AGAINST THE CITCO DEFENDANTS . . . . . . . . . . 51

COUNT III:    GROSS NEGLIGENCE AGAINST PWC . . . . . . . . . . . . . . . . . . . . . . . . 53

COUNT IV:    THIRD PARTY BENEFICIARY AGAINST CITCO AND PWC . . . . . . . . . . 55

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Plaintiff by its attorneys, Deutsch, Metz & Deutsch, LLP for its complaint alleges, upon knowledge as to itself and the actions it took, and upon information and belief as to all other matters, as follows:

1.    The sources of information upon which this complaint is based include: investigations by Plaintiff; investigations by counsel; the complaint filed by the SEC; the criminal complaint filed by U.S. Attorney's Office; and public news reports.

**OVERVIEW**

2.    This is a direct action by G. Philip Stephenson ("Stephenson"), as Trustee of the Philip Stephenson Revocable Living Trust (the "Stephenson Trust", and collectively "Plaintiff"), which is a limited partner in Greenwich Sentry, LP ("Sentry").  Plaintiff invested $60 million in Sentry on or about April 2008.  Sentry is a "feeder fund" which placed almost all of the funds invested by its limited partners (the "Limited Partners") with Bernard Madoff and his firm in the recently discovered "Ponzi scheme" which he ran (which has failed and resulted in billions of dollars in losses).  Plaintiff's investment has been essentially, and unnecessarily (but for the failures of defendants), wiped out.  This action seeks to recover damages from various entities responsible owing to their breach of duty and/or negligence.

3.    On or about December 10, 2008, it was disclosed that Bernard L. Madoff ("Madoff"), acting through Bernard L. Madoff Investment Securities, LLC (together with Madoff, "the Madoff Firm") had at all times been running a Ponzi scheme so that "profits" reported to some persons whose funds were managed by them (particularly the earlier investors), were in fact nonexistent, and the payment of such "profits" to those persons was in fact being made from the capital of newer investors. On December 11, 2008, the Securities and Exchange Commission sought the appointment of a receiver for the Madoff Firm and filed charges against

The Madoff Firm, and on that same day, the United States Attorney brought criminal charges against Madoff.

4.     As is alleged further herein, Plaintiff relied upon defendants, as the administrator and auditors/accountants for Sentry, to independently confirm and verify Madoff's reported trading results for Sentry, its Limited Partners and Plaintiff, and to accurately value, confirm and report on the Net Asset Values ("NAVs") of Sentry, its Limited Partners and Plaintiff. Despite the existence of Red Flags which should have alerted defendants, in the exercise of reasonable due care and diligence, to the Ponzi scheme and the looting of Plaintiff's account to pay "distributions" to other Limited Partners, defendants did not recognize the Red Flags or appreciate their significance, and/or did not advise Plaintiff of them. In so doing, defendants breached their fiduciary duties, and/or were grossly negligent. Plaintiff has been damaged in an amount not less than $60 million, for which defendants must be held liable.

## THE PARTIES AND RELEVANT ENTITIES

### A.     The Plaintiff

5.     The Stephenson Trust is formed under the laws of the State of Texas. Stephenson is the sole trustee of the Stephenson Trust and is empowered pursuant to the Trust Agreement to bring this action. The Stephenson Trust is a Limited Partner in Sentry, having invested $60 million in Sentry in or about April 2008.

6.     The investment in April 2008 was originally made in the name of G. Philip Stephenson. Stephenson requested that the accountholder name be changed to the Stephenson Trust, and by execution of a new subscription agreement dated as of June 1, 2008 in the name of

the Stephenson Trust and transfer as of that date of the entire balance of the previous account into a similarly-titled account, that change was effectuated.

## B.    The Fairfield Entities and Persons (Non-Parties)

7.      Sentry is a Delaware limited partnership organized in or about December 1990 as Aspen/Greenwich Limited Partnership.  It changed its name to "Greenwich Sentry, LP" on or about December 4, 1992.

8.      Sentry is registered with the State of New York as authorized to transact business in the State of New York.  Sentry maintains its offices in the State and County of New York and does business in the State and County of New York.  Sentry's principal place of business is in the State and County of New York.  Sentry transacted business in and from the State and County of New York in connection with the matters at issue.  Sentry maintained its bank accounts in connection with the Fund at issue in the State of New York.

9.      Fairfield Greenwich Group ("FGG") is a Delaware limited liability company with its principal place of business in the State and County of New York.  It holds itself out as a leading asset investment specialist, managing its own funds and, *inter alia*, selecting external managers for funds, and had its subsidiaries, affiliates and/or officers act as general partners. Various persons and entities affiliated with the Fairfield Group served as the General Partner of Sentry over time, including:  Fairfield Greenwich (Bermuda) Ltd., from 2006 through the present; Fairfield Greenwich, Limited (a Cayman Islands company which is a subsidiary of the Bermuda company), from 2003 through 2006; and Walter M. Noel, Jr. and Jeffrey H. Tucker (founding partners and Directors of the Fairfield Group and/or its affiliates), from inception

through 1998. Collectively these persons and entities are referred to herein as the "Sentry General Partners". FGG and Fairfield Greenwich Limited are registered as authorized to transact business in the State of New York; FGG and the Sentry General Partners all transacted business in the State and County of New York in connection with the matters at issue herein, and/or maintain offices and/or presence in the State and County of New York.

## C.    The Citco Defendants

10.    Defendant Citco Group Limited ("Citco Group") is an independent financial services organization with approximately 46 offices in 27 countries around the world, including in New York. Citco Group is an integrated financial services holding company that operates through numerous subsidiaries, including defendants Citco Fund Services (Europe) BV and Citco (Canada), Inc. Citco Group is a Cayman Islands corporation with its registered office in the Cayman Islands and administrative offices in Nyon, Switzerland and in Monaco. Citco Group holds itself out as having two "offices and locations" in the State and County of New York.

11.    Defendant Citco Fund Services (Europe) BV ("Citco Europe") is a limited liability company formed under the laws of the Netherlands and is a wholly owned subsidiary of Citco Group. Its principal place of business is in Amsterdam, The Netherlands. As is described further herein, Citco Europe has been Sentry's fund administrator since September 1, 2006.

12.    Defendant Citco (Canada), Inc. ("Citco Canada") is a Canadian corporation and is a wholly owned subsidiary of Citco Group. Its principal place of business is in Ontario, Canada. As is described further herein, Citco Canada, by delegation from Citco Europe, has functioned as a sub-administrator of Sentry's funds since September 1, 2006.

13.     Citco Group holds itself out as the world's top provider of hedge fund administration services. Citco Group represents that its services and those of its "subsidiaries" and affiliates include corporate and fiduciary services, fund administration and shareholder services, custody and banking services, fund advisory and brokerage services, and international pension services. Citco Group has no independent revenues of its own; all of its revenues are derived from its operations through its "subsidiaries". Citco's website describes its "subsidiaries" as parts of its operating divisions, and are collectively referred to thereon as "Citco". All Citco Group "subsidiaries" use the same Citco logo on their letterhead – emphasizing the global, integrated nature of Citco Group. Citco Group holds itself out as an integrated corporate structure and represents that it, with its "subsidiaries", constitutes a "global fund administrator" and that the combined enterprise provides a "consistent service platform". Citco Group and its "subsidiaries" are referred to collectively as "Citco".

14.     The managing director of each Citco office providing fund administration services, including defendants Citco Europe and Citco Canada, report to William Keunen ("Keunen"), who was or is the Global Director of Fund Services for Citco Group, and operates from its Miami office. Keunen, in turn, reports to the executive committee of Citco Group.

15.     Citco's website represents to the public that:

> Our Hedge Fund Service offering includes fund accounting and net asset value calculations, investor relations services, anti-money laundering compliance, corporate & legal services, . . . tax reporting and financial statement preparation. Citco's on-line reporting tools, . . . offer both investment managers and investors an extensive suite of online reports to provide them with the tools they need to operate efficiently and effectively.
>
> Citco also offers a complete front-to-back offering for single manager funds, combining portfolio capture and real-time position monitoring

-5-

technology . . . with middle and back office operations support. * * *

16.     Substantially all information as to Citco's clients and the funds it administers is maintained in a centralized computer database located in the United States by Citco Technology Management, Inc., which is held out by Citco as its "dedicated Information Technology Group", and is a Florida corporation registered as authorized to transact business in the State and County of New York.

**D.      PricewaterhouseCoopers**

17.     Defendant PricewaterhouseCoopers, LLP (an Ontario Partnership) ("PWC") is a limited liability partnership organized under the laws of the province of Ontario, Canada with its principal place of business in Ontario, Canada.

18.     PWC is a member firm of PricewaterhouseCoopers International Limited ("PWC Int'l").  PWC Int'l and all of its member firms, including PWC, operate as a self-described network of inter-connected member firms providing auditing and accounting services across an international platform by which means they are globally operational.  PWC Int'l and the member firms maintain centralized control over training, standards of care, marketing, and quality of accounting and auditing work throughout the world.  PWC Int'l and its member firms hold themselves out as and operate as a unified business entity.

19.     PWC is engaged in the business of providing auditing, accounting and other investment and advisory services.  As of December 2006, the PWC touted itself publically as serving "70 of the top 100 asset managers around the world."

20.     As is described further herein, PWC was the accountant and auditor of Sentry for

a period of years, including at least 2006 through 2008. As is described further herein, during the entire period, PWC reported upon the financial statements and results of operations of Sentry and issued unqualified reports thereon.

21.     Another of PWC Int'l's member firms audited Fairfield Sentry Ltd., which is a sister fund of Sentry's and which is operated by FGG. Fairfield Sentry Ltd. was operated as a substantially identical limited partnership with a substantially identical investment strategy (the primary differences between the two being that investment in Fairfield Sentry Ltd. was only open to overseas investors, and it had been in operation longer than Sentry). PricewaterhouseCoopers Netherlands has been Fairfield Sentry Ltd.'s auditor and accountant. The Madoff Firm was the custodian of Fairfield Sentry Ltd.'s assets.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. 1332(a). The Stephenson Trust is formed under the laws of the State of Texas and Stephenson, the sole trustee of the Stephenson Trust, is a citizen of the State of Texas. Defendant Citco Group is a citizen of the Cayman Islands-British West Indies. Citco Europe is a citizen of the Netherlands. Citco Canada is a citizen of Canada. PWC is a citizen of Canada. The matter in controversy exceeds $75,000.00.

23.     The exercise of personal jurisdiction over the Defendants by this Court is appropriate and will not offend traditional notions of fair play and substantial justice because each of the Defendants has sufficient minimum contacts with the State of New York.

24.     Jurisdiction is appropriate against Defendant Citco Group because it has sufficient

minimum contacts with the State and County of New York. Citco Group is a worldwide

company with offices located throughout the world, including at least one in the State and

County of New York itself, through which it conducts regular, systematic and continuous

business activities resulting in the derivation of substantial revenues from the United States and

New York. Citco Europe and Citco Canada are wholly owned and controlled subsidiaries of

Citco Group. Citco Group has no independent revenues of its own; all of its revenues are derived

from its subsidiaries, including defendants Citco Europe and Citco Canada. Citco Group

specifically authorized its subsidiaries, including Citco Europe and Citco Canada to act for it as

its operational arm. Each of the subsidiaries operate in a semi-autonymous manner but they each

support each other in the performance of their obligations and all of the them take ultimate

direction from and are under the control of Citco Group. Indeed, as alleged herein, Citco Europe

and Citco Canada, report to the Global Director of Fund Services for Citco Group who is

employed by a Citco Group subsidiary incorporated in the State of New York and who, in turn,

reports to the executive committee of Citco Group. Further, Citco Europe and Citco Canada

share one centralized computer database maintained by another subsidiary (a corporation

authorized to do business within the State of New York) and under the control of Citco Group.

Thus, not only does Citco Group itself maintain profitable direct contacts with the United States

and the State and County of New York, but as alleged herein defendants Citco Europe and Citco

Canada, are the agents and/or alter egos of Citco Group, and as such their substantial, direct,

continuous and systematic contacts with the United States and the State and County of New York

should be imputed to Citco Group.

     25.    Jurisdiction is appropriate against Defendant Citco Europe because it has

sufficient minimum contacts with the State of New York.  Citco Europe purposefully entered

into a contract to act as fund administrator and to provide the services alleged herein to Sentry,

whose business was within the State and County of New York and who was actively doing

business within the State and County of New York.  Citco Europe, as alleged more fully herein,

provided those services to Sentry, including, *inter alia*, creating the NAVs which form a part of

Plaintiff's claim.  Citco Europe purposefully sent monthly financial documents, *inter alia*, the

NAVs it created, to Sentry in New York.  Citco Europe purposefully undertook, as one the

services it was to provide to Sentry, to communicate to Sentry's Limited Partners and as part of

those services, *inter alia,* purposefully and regularly sent financial documents, including the

NAVs it created, to Sentry Limited Partners in New York.  The NAVs sent to New York to

Sentry and its Limited Partners were all on Citco Europe letterhead.  Citco Europe needed to

have, and did in fact have, regular and systematic contact with Sentry and the Sentry General

Partners (all of whom were located in New York) in order to  perform the services which it

contracted to and did perform as Sentry's fund administrator.  Citco Europe needed to have, and

did in fact have, regular and systematic communications with Madoff and/or the Madoff Firm

(who were located in New York) in order to perform the services which it contracted to and did

perform as Sentry's fund administrator.  Citco Europe maintained a bank account at HSBC Bank

in the State and County of New York through the Citco Group into which Sentry's Limited

Partners were directed, and did, send their investments to that bank account for ultimate use by

Sentry.  Citco Europe had regular and systematic communications with HSBC Bank in the State

and County of New York in regards to that account and the Limited Partners funds in order to

perform its services as Sentry's funds administrator.  Citco Europe maintained these contacts on

a regular and systematic basis from September 2006 to the present. Citco Europe derived

significant income from Sentry and/or the Sentry General Partners due to its contacts with New

York in that it collected significant fees for performing the hereinafter described services for

Sentry. The acts of Citco Canada as agent, which it performed by delegation of responsibility by

Citco Europe, are attributable to Citco Europe as principal, for purposes of assessing Citco

Europe's contacts with New York. Citco Europe does substantial other business in the State and

County of New York as a fund administrator. The claims against Citco Europe spring directly

from and are directly related to its contacts within the State and County of New York. The State

and County of New York has a direct and substantial interest in seeing that the persons and/or

entities contracting to provide and actually providing financial services to entities doing business

in New York (including the partners and/or investors in those New York entities) perform those

services in a professional and/or non-negligent way and that they do so within the bounds of the

fiduciary duties which they owe.

26.     Jurisdiction is appropriate against Defendant Citco Canada because it has

sufficient minimum contacts with the State of New York. Citco Canada purposefully entered

into a contract to act as fund sub-administrator and to provide the services alleged herein to

Sentry, whose business was within the State and County of New York and who was actively

doing business within the State and County of New York. Citco Canada, as alleged more fully

herein, provided those services to Sentry, including, *inter alia*, providing all of the financial and

services required to allow Citco Europe to create the NAVs which form a part of Plaintiff's

claim. Citco Canada purposefully created the monthly financial documents, *inter alia*, the

information contained with the NAVs, for Citco Europe which Citco Europe then sent to Sentry

-10-

in New York.  Citco Canada purposefully undertook to create the financial documents and information knowing that it would be sent to Sentry in the State and County of New York.  Citco Canada purposefully undertook to create the financial documents and information knowing that it would be, *inter alia,* sent in the form of monthly financial documents, including, the NAVs, to Sentry Limited Partners in New York.  The NAVs sent to New York to Sentry and its Limited Partners, all on Citco Europe letterhead, were created from financial documents and information generated by Citco Canada specifically for that purpose.  Citco Canada needed to have, and did in fact have, regular and systematic contact with Sentry and the Sentry General Partners (all of whom were located in New York) in order to  perform the services which it contracted to and did perform as Sentry's fund sub-administrator.  Citco Canada needed to have, and did in fact have, regular and systematic communications with Madoff and/or the Madoff Firm (who were located in New York) in order to perform the services which it contracted to and did perform as Sentry's fund sub-administrator.  Citco Canada had regular and systematic communications with HSBC Bank in the State and County of New York, at which Citco Europe maintained a bank account through the Citco Group and into which Sentry's Limited Partners were directed, and did, send their investments to that bank account for ultimate use by Sentry, in order to perform its functions as Sentry's funds sub-administrator.  Citco Canada maintained these contacts on a regular and systematic basis from September 2006 to the present.  Citco Canada derived significant income from Sentry and/or the Sentry General Partners due to its contacts with New York in that it collected significant fees for performing the hereinafter described services for Sentry.  Citco Canada does significant other business in the State and County of New York as a funds sub-administrator.  The claims against Citco Canada spring directly from and are directly

-11-

related to its contacts within the State and County of New York.  The State and County of New York has a direct and substantial interest in seeing that the persons and/or entities contracting to provide and actually providing financial services to entities doing business in New York (including the partners and/or investors in those New York entities) perform those services in a professional and/or non-negligent way and that they do so within the bounds of the fiduciary duties which they owe.

27.     Jurisdiction is appropriate against Defendant PWC because it has sufficient minimum contacts with the State of New York.  PWC purposefully entered into a contract to act as auditor and/or accountants for Sentry and to provide the services alleged herein to Sentry whose business was within the State and County of New York and who was actively doing business within the State and County of New York.  PWC, as alleged more fully herein, provided those services to Sentry, including, *inter alia*, issuing unqualified audited reports attesting to the accuracy of Sentry's financial statements which form a part of Plaintiff's claim.  PWC purposefully sent financial documents, *inter alia*, the audited financial reports and other documents to Sentry in New York.  PWC purposefully communicated with Sentry's Limited Partners as part of its services to Sentry's Limited Partners in New York.  PWC needed to have, and did in fact have, regular and systematic contact with Sentry, the Sentry General Partners and any banks holding Sentry's investor funds (all of whom were located in New York) in order to  perform the services which it contracted to and did perform as auditors of and accounts to Sentry.  PWC maintained these contacts on a regular and systematic basis from at least 2006 to the present.  PWC derived significant income from Sentry and/or the Sentry General Partners due to its contacts with New York in that it collected significant fees for performing the hereinafter

described services for Sentry. The claims against PWC spring directly from and are directly related to its contacts within the State and County of New York. The State and County of New York has a direct and substantial interest in seeing that the persons and/or entities contracting to provide and actually providing financial services to entities doing business in New York (including the partners and/or investors in those New York entities) perform those services in a professional and/or non-negligent way and that they do so within the bounds of the fiduciary duties which they owe.

28.     Further, the State of New York would have had personal jurisdiction against defendants over the claims alleged herein because:

>       (a)     pursuant to CPLR § 302(a)(1) because each transacted business and/or contracted to provide services within the State of New York and the claims against it arise from that business and/or services; and/or

>       (b)     pursuant to CPLR § 302(a)(3)(i) because each committed tortious acts outside the State of New York which caused injury within the State and it regularly does or solicits business in the State and derives substantial revenue from services rendered in the State; and/or

>       (c)     pursuant to CPLR § 302(a)(3)(ii) because each committed tortious acts outside the State of New York which caused injury within the State and it reasonably should have expected those acts to have consequences in the State and it derives substantial revenue from interstate or international commerce.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because:

>       (a)     all defendants are aliens, and are therefore amenable to venue in any

-13-

District;

(b)      a substantial part of the events or omissions giving rise to the claims

herein occurred in this District; and/or all of the defendants are subject to personal

jurisdiction in this District at the time the action was commenced and there is no

other jurisdiction in which the action may otherwise be brought.

(c)      Sentry has its office and principal place of business in this District;

(d)      the trading and valuations underlying Plaintiff's claims originated in and

were executed in this District;

(e)      all defendants, directly or indirectly through subsidiaries and affiliates,

transacted business in this District in connection with the matters at issue;

(f)      many of the documents were distributed to actual or potential investors in

this District; and

(g)      the majority of the evidence and witnesses are located in this District.


## FACTS COMMON TO ALL COUNTS

**A.      THE OPERATIONS OF SENTRY**

30.      Sentry operated as a "feeder fund" and placed all or substantially all of its Limited

Partners' investments in a brokerage account in the custody of the Madoff Firm.  The Madoff

Firm was the trader and broker of the Sentry accounts, and traded the account on a discretionary

basis.  The stated results for Sentry's account were based on Madoff's reports of his trading,

which in turn were reported upon by Sentry's administrator and auditor.  The Madoff Firm

served as custodian for the securities and funds in the Sentry account.

31.     The Confidential Offering Placement Memorandum dated as of August 2006 for

Sentry (the "Sentry PPM") described how the Limited Partners' funds would be invested:

> The Partnership seeks to obtain capital appreciation of its assets princi-
> pally through the utilization of a nontraditional options trading strategy
> described as "split strike conversion", to which the Partnership allocates
> the predominant portion of its assets. ***
>
> The establishment of a typical position entails (i) the purchase of a group
> or basket of equity securities that are intended to highly correlate to the
> S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put
> options with a notional value that approximately equals the market value
> of the basket of equity securities, and (iii) the sale of out-of-the-money
> S&P 100 Index call options with a notional value that approximately
> equals the market value of the basket of equity securities. * * *  The basket
> typically consists of between 35 to 50 stocks in the S&P 100 Index.
>
> The primary purpose of the long put options is to limit the market risk of
> the stock basket at the strike price of the long puts. The primary purpose of
> the short call options is to largely finance the cost of the put hedge and to
> increase the stand-still rate of return.
>
> This position in its entirety could be characterized as a bull spread which,
> presuming the stock basket highly correlates to the S&P 100 Index, is
> intended to work as follows: (i) it sets a floor value below which further
> declines in the value of the stock basket is offset by gains in the put
> options, (ii) it sets a ceiling value beyond which further gains in the stock
> basket are offset by increasing liability of the short calls, and (iii) defines a
> range of potential market gain or loss, depending on how tightly the
> options collar is struck.
>
> The degree of bullishness of the strategy can be expressed at implementa-
> tion by the selection of the strike prices in the S&P 100 Index put and call
> options. The farther away the strike prices are from the price of the S&P
> 100 Index, the more bullish the strategy.
>
> The Split Strike Conversion strategy is implemented by Bernard L. Madoff
> Investment Securities LLC ("BLM"), a broker-dealer registered with the
> Securities and Exchange Commission, through accounts maintained by the
> Partnership at that firm. The accounts are subject to certain guidelines
> which, among other things, impose limitations on the minimum number of
> stocks in the basket, the minimum market capitalization of the equities in

the basket, the minimum correlation of the basket against the S&P 100 Index, and the permissible range of option strike prices. Subject to the guidelines, BLM is authorized to determine the price and timing of stock and option transactions in the account. The services of BLM and its personnel are essential to the continued operation of the Partnership, and its profitability, if any.

The options transactions executed for the benefit of the Partnership may be effected in the over-the-counter market or on a registered options exchange.

Sentry PPM, at 8-9.

32.     From the inception of the relationship between Sentry and the Madoff Firm (and until the Ponzi Scheme was disclosed in December 2008), Limited Partners could withdraw any portion of the funds they invested at the end of any month.  Limited Partners regularly withdrew stated "profits" and or "capital", in whole or in part.  As is alleged further herein, Plaintiff never withdrew or received any funds from his account.

33.     Sentry charged each Limited Partner a management fee of approximately 1% of the Limited Partner's monthly capital account balance (the "Management Fee") and a quarterly fee of 20% of the realized and unrealized net capital appreciation, subject to adjustment (the "Incentive Fee"),  which fees were paid to the Sentry General Partners.  Sentry generated millions of dollars in fees annually to the Sentry General Partners.

## B.     THE ROLE OF CITCO

34.     Citco held itself out as having highly specialized expertise, policies and procedures to ensure that the reports it issued as to Sentry's portfolio and NAV valuations would be accurate and that any questions pertaining thereto would be investigated and resolved by Citco

and, if not resolved, that such would be promptly reported.

35.     The public representations and statements of Citco, including its officers, demonstrate that Citco knew that it was a fiduciary to Plaintiff and that valuation of Sentry's portfolios was one of, if not, its primary roles as administrator.  Citco continuously held itself out as a fiduciary to various funds' investors, including Plaintiff.  Thus, the Citco Fund Services website states that:

> By providing fully independent services, we act as a reliable fiduciary to safeguard the interests of investors. We train our staff to provide specialist accounting and valuation support, investor relations, corporate services and day to day management.

36.     With respect to NAV reports to investors, William Keunen, the Global Director of Fund Services for Citco wrote, "the administrator's primary responsibility is as a fiduciary agent to a fund's investors. In addition, the administrator should be relied upon for an independent verification role that is efficient and accurate."

37.     Citco was also aware of the danger that structural or operational risk represented. In May 2003, John M.S. Verhooren, a Citco officer, told the publication Hedge Funds Review that two of the most important

> duties of Citco Group's subsidiaries in administering a hedge fund are determining and verifying the fund's NAV and fulfilling the administrator's 'risk monitoring' responsibilities.
>
> * * *
>
> A study of 100 hedge fund failures ... concluded that operational risks are the main single cause of hedge fund failure.
>
> * * *
>
> It found that in those cases where the finger can be pointed at fraud and misrepresentation, water-tight operational standards can either reduce the

size of losses or enable them to be uncovered at a much earlier stage.
* * *

The operational arena is the one most affected by the quality of a fund's counterparties, in particular its prime brokers and administrators. Institutional investors want an institutional quality administrator with experienced and appropriately qualified staff, independent pricing and valuation procedures, and the technology to support its enhanced role.

38.     The Sentry PPM represented, *inter alia*, that Citco Europe  and Citco Canada as the administrators of Sentry were:

to provide certain financial accounting, administrative and other services [as well as] . . . registrar and transfer agent services. [Citco Europe] . . . has delegated the accounting, registrar and transfer services to Citco (Canada) Inc. (the "Sub-Administrator").   ***

[T]he Administrator will be responsible, *inter alia*, for the following matters for the Partnership under the general supervision of the General Partner:

• communicating with Limited Partners;

• maintaining the record of accounts;

•  processing subscriptions and withdrawals;

•  preparing and maintaining the Partnership's financial and accounting records and statements;

• calculating each Limited Partner's capital account balance (on a monthly basis);

• preparing financial statements;

• arranging for the provision of accounting, clerical and administrative services; and

• maintaining corporate records.

Sentry PPM at 11-12.

-18-

39.     In the course of performing these responsibilities, Citco undertook to, *inter alia*:
maintain true and accurate financial books and records of Sentry; receive and evaluate informa-
tion with respect to Sentry from the Madoff Firm; investigate and confirm the trading activity of
the Madoff Firm for Sentry and its Limited Partners; investigate and confirm the NAVs of Sentry
reported by the Madoff Firm; compile, investigate, confirm and/or correct the data in Sentry's
weekly and monthly fund reports; accurately calculate the NAVs and capital account balances of
Sentry and the Limited Partners and advise them of such, as well as any "profit" or "apprecia-
tion" or lack thereof; confirm the implementation, execution, and success of the investment
strategy described in the Sentry PPM; receive and process investments by new and existing
Limited Partners; calculate and administer distributions of "capital", "profits" and "appreciation"
to Limited Partners; communicate with Sentry, its Limited Partners, and others (including
without limitation the Madoff Firm) with respect thereto; supervise the payment of Sentry's
expenses; and perform day-to-day administrative services for Sentry and its Limited Partners.

40.     The Sentry PPM was sent to each Limited Partner by Sentry in advance of the
partner's investment.  The Sentry PPM was approved by Citco prior to its circulation.

41.     Pursuant to the Sentry PPM, Citco's fees in relation to Sentry were a percentage
of the stated Net Asset Value of the Fund.  Citco had a financial motive to inflate or overstate
Sentry's NAVs, and/or had a financial motive to overlook, disregard, minimize, or fail to
disclose information which would decrease Sentry's stated NAVs.

42.     Further, because Citco and PWC knew that the limited partnership interests in
Sentry were not publically traded and no other independently verified third-party financial
information about Sentry was available to Limited Partners or prospective Limited Partners of

Sentry other than Citco's NAVs and PWC's audit reports and audited financial statements, Citco

and PWC knew and intended that its NAVs and unqualified audit reports and audited financial

statements would be the primary sources of information to Plaintiff and would be relied upon in

making investment decisions with respect to its investment in Sentry.  The Limited Partners,

including Plaintiff, reasonably and foreseeably did in fact so rely.


**C.     THE ROLE OF PWC**

43.     PWC and its sister offices hold themselves out as a leading accounting and

auditing firm with specialized expertise in hedge funds and investment vehicles and offered

clients:

> Assistance with the set-up and establishment of Hedge Funds through
> regulatory, tax and operational advices, the optimization of fund and
> management company tax set-up, advice in local and cross-border
> outsourcing and regarding fund consolidation
>
> Assurance of Hedge Funds through statutory audits and long form reports,
> SAS 70 and AIMR-GIPS certification and
>
> Performance improvement advisory to the fund, compliance and AML
> system selection and implementation, benchmark and cost optimization,
> financial risk management, research, and training through our dedicated
> entity, PwC ACADEMY.

http://www.pwc.com/lu/eng/challenges/hedge_funds.html.

44.     PWC consented to Sentry identifying it as the auditor and accountants for Sentry.

PWC knew that the Sentry PPM was to be used as the basis for continued solicitation of limited

partners into Sentry.  PWC knew and intended that the Limited Partners, including Plaintiff,

would rely on PWC to perform its services in accordance with the highest professional standards

applicable thereto and also knew that, because of its standing in the financial community, its

decision to become the auditor of Sentry added to the purported safety and quality of the Sentry

offering.  Plaintiff would never have invested in Sentry without the presence of a Big Four

accounting firm as auditor for Sentry and knew that PWC was the auditor.

45.     Each year, PWC conducted an audit which it stated it had conducted in accor-

dance with auditing standards generally accepted in the United States, and issued an unqualified

audit report attesting to the accuracy of Sentry's financial statements in accordance with

accounting principles generally accepted in the United States.  These reports were addressed "to

the partners of Greenwich Sentry, LP".

46.     The Sentry PPM which PWC reviewed and approved stated that:

> The Partnership's independent certified accountants (selected by the
> General Partner) will audit the Partnership's books and records as of the
> end of each fiscal year. Within 90 days after the end of each fiscal year the
> Partnership will mail to the Limited Partners the Annual Report prepared
> by its independent certified public accountants setting forth a balance sheet
> of the Partnership, a profit and loss statement showing the results of
> operations of the Partnership and its Net Capital Appreciation or Net
> Capital Depreciation, a statement of such Partner's Capital Account and
> the manner of its calculation and the Partnership Percentage as of the end
> of the prior fiscal year. At the end of each fiscal year, each Partner will be
> furnished the required tax information for preparation of their respective
> tax returns. Within 30 days following the end of each fiscal quarter in each
> fiscal year, each Partner will be mailed unaudited financial information
> setting forth, inter alia, a statement of its Net Capital Appreciation or Net
> Capital Depreciation; provided, however, that the General Partner may
> send out reports on a more frequent basis and has elected to provide
> monthly reports within 30 days following the end of each month.

Sentry PPM at 36-37.

47.     PWC had complete access to Sentry's books and financial records and was fully

familiar with the management, business practices and procedures of Sentry.  PWC also per-

formed various services for the officers of Fairfield Greenwich and related funds and companies. PWC's engagement by and relationships with these other entities gave it greater actual knowledge than is usual for an accountant and auditor with respect to material facts respecting the transactions between Sentry and the Madoff Firm.

48.     Commencing no later than January 2003, PWC was required under GAAS to actively consider whether there was a risk that the financial statements it was auditing contained material misstatements due to fraud, to identify the risks thereof and to communicate those concerns, if any, to the management of Sentry.  Two types of fraud are of particular concern under GAAS: misstatements of financial condition and misappropriation of assets and their concealment by management and/or third parties.  PWC was required to exercise "Professional Skepticism":

> The auditor should conduct the engagement with a mind set that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity.  In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

AU § 316, .13.

49.     In order to perform their functions PWC's audit team is required to "brainstorm" about

> how and where they believe the entity's financial statements might be susceptible to material misstatement due to fraud, how management could perpetrate and conceal fraudulent reporting and how assets of the entity could be misappropriated.

Id., at .14.

-22-

50.    In that regard PWC was required to consider any unusual or unexpected relation-
ships identified and to understand the entity's business and the industry in which it operates.

51.    With respect to the audit work it performed for Sentry, PWC was required by
Generally Accepted Auditing Standards ("GAAS") as well as the ethics of the auditing profes-
sion, to satisfy itself that (and PWC failed to do so or did so negligently):

      (a)    the financial statements of Sentry on which it reported had been audited in
      accordance with GAAS; and

      (b)    the financial statements of Sentry presented fairly its financial positions;

          (i)    gave a true and fair view in all material respects of the state of
          affairs of Sentry, and the profits or losses and the source and application of
          funds of Sentry;  and

          (ii)    did not misstate or omit information which was material to truthful
          and fair presentation and understanding thereof.

52.    In connection with the audit work it performed, PWC was required to adhere to
the following GAAS, among others (and PWC failed to do so or did so negligently):

      (a)    maintain independence and due professional care in performing the
      examination and preparing the audit report;

      (b)    perform a proper study and evaluation of existing internal controls and
      additional testing procedures to serve as a basis of reliance for audit procedures;

      (c)    obtain sufficient competent evidence to afford a reasonable basis for an
      opinion regarding the financial statements under audit;

      (d)    fulfill its responsibilities for the detection and reporting of errors and

-23-

irregularities;

(e)    consider, evaluate and disclose the entity's ability to continue as a going

concern;

(f)    provide a statement that informative disclosure in the financial statements

is to be regarded as reasonably adequate unless otherwise stated;

(g)    appropriately qualify its opinion when an unqualified opinion on the

financial statements as a whole cannot be expressed; and

(h)    disclose sufficient information to enable the reader to appreciate the nature

of the transactions reported upon.

53.    In connection with audit work it performed and as to information supplied to it by

Sentry, Citco, Madoff and/or the Madoff Firm, PWC was required by GAAP and/or GAAS to

(and PWC failed to do so or did so negligently):

(a)    consider the materiality of and likelihood of significant error in the

information supplied to it;

(b)    evaluate such information to determine whether it was sufficiently relevant

and reliable for PWC to draw reasonable conclusions from it;

(c)    consider whether there were any alternative sources of audit evidence;

(d)    consider the relationship among Sentry, Citco, and the Madoff Firm;

(e)    issue a qualified audit report if it believed that such information was

insufficient to enable it to draw reasonable conclusions;

(f)    obtain relevant and reliable evidence to enable it to prepare the financial

information to be included in its report;

-24-

(g)     form an opinion on that information, satisfy itself that all relevant informa-

tion has been considered with due care; and

(h)     disclose details of any contingent liabilities.

54.     With respect to accounting work it performed for Sentry, PWC was required, by

GAAS and GAAP, to satisfy itself that the statements, reports and analyses which it compiled,

presented, reported upon did not contain material misstatements or omissions of fact.  PWC

failed to do so or did so negligently.

55.     With respect to accounting work it performed for Sentry, PWC was required to

adhere to the following principles of GAAP (and PWC failed to do so or did so negligently):

(a)     disclosure should be adequate and fair;

(b)     the financial information presented should be complete and show a "true

and fair view";

(c)     the commercial effect of the transactions should be analyzed; and

(d)     all of the entity's transactions should be considered as a whole.

56.     With respect to the accounting and auditing work it performed for Sentry, PWC

was required to withdraw and/or correct any opinion it had previously issued on the financial

statements of Sentry, and/or to correct any statements, forecasts, reports and analyses (or

assumptions relating thereto) which it compiled, presented, reported upon, or assisted as to, upon

learning that such materially misstated and/or omitted material facts.

57.     PWC knew and intended that the audit reports, statements, reports and analyses

which it compiled, presented, reported upon, or assisted as to, were material to the true and fair

presentation and understanding of the financial position and affairs of Sentry, and intended that

they would be relied upon by Sentry and the Limited Partners.

58.     Further, because Citco and PWC knew that the limited partnership interests in Sentry were not publically traded and no other independently verified third-party financial information about Sentry was available to Limited Partners or prospective Limited Partners of Sentry other than Citco's NAVs and PWC's audit reports and audited financial statements, Citco and PWC knew and intended that its NAVs and unqualified audit reports and audited financial statements would be the primary sources of information to Plaintiff and would be relied upon in making investment decisions with respect to its investment in Sentry. The Limited Partners, including Plaintiff, reasonably and foreseeably did in fact so rely.

59.     For substantial fees, PWC issued unqualified reports and permitted the annual financial statements of Sentry to contain such reports.

60.     PWC represented that its annual examinations had been made in accordance with GAAS and that the financial statements presented fairly the financial positions of Sentry at the respective dates, and in conformity with GAAP. PWC further represented that its examinations "gave a true and fair view of the state of affairs of Sentry as at [the respective date] and of the results and source and application of funds for the [year/period] then ended ".

## D.     PLAINTIFF'S INVESTMENT IN SENTRY

61.     The Stephenson Trust is a Limited Partner in Sentry, by having invested $60 million in Sentry in or about April 2008 and by executing one or more subscription agreements during the effective period of April 1, 2008 through June 1, 2008.

62.     The Stephenson Trust made its investment in Sentry, pursuant to the instructions

of Sentry and Citco, and under a procedure approved by PWC, by wire transferring its funds to a bank account in the name of Citco Banking Corp., N.V. at HSBC Bank in the State and County of New York, for transfer to an account in the name of Sentry and eventual transfer to an account maintained by Sentry with the Madoff Firm for management and investment. In receiving and transmitting those funds, Citco Banking Corp., N.V. was acting as the agent of Citco, including without limitation of Citco Group, Citco Europe and Citco Canada.

63.    Prior to making its initial investment, Plaintiff received inter alia the following information with respect to Sentry:

(a)    an estimated monthly fund report for Sentry for February 2008, showing a gain of .12% and a YTD gain of .89% (the latter being an annualized gain of 5.34%), and comparing Sentry's performance against losses in the Dow Jones Industrial Average of -3.04% in February and -7.53% year-to-date), and against losses in the S&P 500 Index of -3.25% in February and -9.05% year-to-date;

(b)    a final monthly fund report for Sentry for February 2008, showing substantially the same information as the estimated report previously transmitted;

(c)    estimated weekly fund reports for Sentry for each week in March 2008 showing, in each week, month-to-date and year-to-date gains, as against month-to-date and year-to-date losses in the S&P 500 Index (including, for the month-to-date ending March 24, 2008, Sentry gains of 0.28% month-to-date and 1.17% year-to-date, as against S&P 500 Index losses of -1.16% month-to-date and -10.43% year-to-date);

(d)    the Sentry Limited Partnership Agreement;

-27-

      (e)    the Sentry PPM; and

      (f)    the Sentry Subscription Agreement.

64.    In addition, Plaintiff received documents with respect to the structure and operation of Sentry's sister fund, Fairfield Sentry, and was explicitly told that similar documents for Sentry were in the process of creation, but that Plaintiff could rely upon the information in the Fairfield Sentry documents as accurate and representative of the structure, operation, and performance of Sentry. These documents included:

      (a)    the Private Placement Memorandum of Fairfield Sentry;

      (b)    a printout of a Powerpoint presentation for Fairfield Sentry; and

      (c)    net historical performance data, based on Citco NAV reports, for the Fairfield Sentry Fund as a whole, showing a track record of consistent and impressive positive gains or "profit".

65.    In making its decision to invest in Sentry in or about April 1, 2008, Plaintiff received, read, reviewed and foreseeably and reasonably relied upon the accuracy of the information contained in the foregoing documents and conversations.

66.    Upon Stephenson's request that the April 1, 2008 funds and the account holding them be maintained in the name of the Stephenson Trust, Stephenson was advised by Citco that a separate and new subscription agreement would have to be executed. On or about May 23, 2008, Stephenson executed a new subscription agreement in the name of the Stephenson Trust, and the stated funds in the account were transferred to a new account.

67.    After execution of the original subscription agreement dated as of April 1, 2008 and prior to execution of the subscription agreement dated as of June 1, 2008, Plaintiff received,

read, and foreseeably and reasonably relied upon the accuracy of the following documents in order to determine to execute said latter document and to continue its investment:

       (a)    the financial statements for Sentry for 2006 and 2007, which had been audited by PWC, together with PWC's unqualified opinion; and

       (b)    NAVs for Plaintiff's account for April and May 2008, showing significant stated "appreciation";

       (c)    estimated and/or final monthly fund reports for Sentry for April and/or May 2008, showing consistent gains and stable year-to-date performance.

     68.    Between April 1, 2008 and December 11, 2008, Plaintiff received monthly NAV statements from Citco which ostensibly showed that Plaintiff's investment was increasing in value.  Citco advised Plaintiff that, between April 1 and October 31, 2008, in the course of the seven monthly NAV statements which it transmitted under its letterhead:

       (a)    the equity of Plaintiff's $60 million had risen by more than $2½ million, to $62,540,565 (even net of Management Fees, Incentive Fees, and other "operational expenses");

       (b)    Plaintiff had net appreciations in equity within each and every month, of between .08% and .86%, even in the face of a declining market;

       (c)    Plaintiff had a net appreciation in equity of 4.23% on its investment over a mere seven months;

       (d)    based upon the foregoing, Plaintiff's investment had annualized net gains of between 7.14% and 9.12% at the conclusion of each month from April through October 2008, even in the face of a declining market.

69.     During the period from June 1 to December 11, 2008, plaintiff regularly received estimated and final weekly and monthly Fund Reports for Sentry which consistently showed month-to-date and year-to-date gains for Sentry, as against losses for the Dow Jones Industrial Average and the S&P 500 Index.  By the end of November 2008, these Fund Reports showed year-to-date gains for Sentry of 6.59%, as opposed to year-to-date losses for the Dow Jones Industrial Average of -33.44%, for the MSCI World Index of -43.80%, and for the S&P 500 Index of -37.65%.

70.     Plaintiff foreseeably and reasonably relied upon the accuracy of these statements in determining to allow its funds to remain invested in Sentry.

## E.     SENTRY IS DISCOVERED TO BE PART OF A PONZI SCHEME

71.     In December 2008, the Madoff Firm admitted to operating funds which he and it managed (which includes Sentry) as part of a Ponzi scheme under which profits were falsely reported from the trading activities.  Indeed, from the inception of the relationship between Sentry and the Madoff Firm until December 2008, Sentry almost always reported "profits" and "capital appreciation".   In fact, there were no profits, and the Madoff Firm was using invest-ments made by newer Limited Partners to pay fictitious profits to earlier Limited Partners, in essence "robbing Peter to pay Paul".  Madoff admitted that his business was insolvent, and that it had been for years.

72.     To avoid detection of the Ponzi scheme, retain existing investors, and obtain new victims (until early December 2008, when the scheme fell apart), the Madoff Firm honored requests by existing investors to redeem all or part of their stated "profits" and/or capital.

73.    Thus, requests by Limited Partners in Sentry for such redemptions or return, which could be made at the end of any month pursuant to the governing agreement, were made to Sentry and/or Citco, which then forwarded such requests to the Madoff Firm.  Madoff acted on those requests and forwarded the funds to Sentry and/or Citco, which in turn returned funds to the requesting Limited Partners.  These redemptions were an integral and essential element of scheme in order to avoid collapse and disclosure of the Ponzi Scheme.

74.    In December 2008, Madoff was indicted for running this Ponzi scheme.  At the same time, the SEC obtained, by emergency motion, the appointment of a receiver for the Madoff Firm.

75.    Madoff's actions were a classic "Ponzi" or "pyramid" scheme.  Sentry's funds were handled pursuant to and as part of this "Ponzi scheme".

76.    As a  direct result of this Ponzi scheme:

(a)    Sentry reported fictitious results;

(b)    any Limited Partner that withdrew "profits" or "capital" had either no "profits" and/or "capital" or less capital than was stated; and

(c)    any Limited Partners that increased their "capital" by "reinvesting profits" or making fresh capital contributions had a "capital" account and share of "profits" that was falsely increased.

77.    On or about December 11, 2008, upon learning of the Madoff Ponzi Scheme, Plaintiff requested withdrawal of the entirety of its capital account effective immediately. Plaintiff's request was ignored.  Instead, Plaintiff subsequently learned that redemptions and/or withdrawals from Sentry had been suspended.  Plaintiff has received back none of its original

investment of $60 million, or any profits, dividends, returns or distributions of any kind on that investment.

78.     Plaintiff's investment in Sentry has been essentially, and unnecessarily (but for the failures of defendants), wiped out completely.

79.     The failure of the defendants to acquit their respective obligations, as alleged herein, was a cause of both inducing Plaintiff to invest and thereafter to continue to maintain its investment in Sentry and but for their breaches it would not have invested and thereafter continued its investment.

## F.     THE RED FLAGS

80.     Each of the Red Flags, as hereafter alleged, were material and required Citco and PWC respectively to investigate and resolve under their respective duties, responsibilities and representations independently of the others' duties to Plaintiff, but neither did.  Further, each knew the other had not.  Each of these Red Flags and all together, during the time that Citco and PWC provided services to Sentry and the Limited Partners, would and/or should have placed them on notice of the Ponzi Scheme, including but not limited to at least the following:

**Red Flag No. 1**

**Operational Risk Was At A High Level At the Madoff Firm**

81.     In a typical investment fund there is a segregation of investment management, executing broker and custodian functions to protect against operational risk.  In the case of the Madoff Firm, it performed all these functions:  the securities of Sentry were held by the Madoff Firm and not by an independent custodian, the Madoff Firm executed the trading strategy, it was

the executing broker and it reported the results. As a result there was no segregation of duties among independent reporters and thus a lack of internal control which resulted in a lack of investment transparency such that risk management was materially compromised.

82.    It is generally accepted in the financial industry that the potential impact of operational risk greatly exceeds that of investment strategy risk (*i.e.*, trading results). Among the most critical elements in protecting against operational risk are segregation of assets from the manager of the fund to reduce the risk of misappropriation, transparency of reporting to prevent the manager from issuing false reports on trading, and robust controls at each stage of the trading cycle over trade authorization, execution, confirmation, settlement reconciliation and accounting. Yet in each of these areas the Madoff Firm had exclusive control.

**Red Flag No. 2**

**The Madoff Firm's Transactions Were At Variance With Market Evidence**

83.    Despite the fact that the Madoff Firm was acting as an investment advisor, it did not register as an investment advisor with the SEC until it was required to do so in September 2006, under a settlement with the SEC. The ADV Report of the Madoff Firm then disclosed that it had over $17 billion in assets under management in 23 accounts and that between 1 and 5 people "performed investment advisory functions."

84.    The Madoff Firm and Madoff had one investment model, the Split Strike Conversion Strategy ("SSC") which they utilized for all 23 accounts under management. The execution of SSC would have been done in the same manner for all accounts, based on the same methodology and market timing signals. In many cases, the positions Madoff claimed to have placed using the SSC methodology were in excess of the actual open interest in the S&P 100 Put

& Call market in those securities and the entry and exit of over $17 billion would have over-whelmed the S&P 100 Put and Call market.

85.    There are, broadly, two forms of options in the U.S.:

(a)    Exchange traded options, such as the S&P 100, ("listed options") which have standardized contracts, and are settled through a clearing house with fulfillment guaranteed by the credit of the exchange. Since the contracts are standardized and marked to market each day, accurate pricing is available.  Listed options can be exercised at any time between the date of purchase and expiration; and

(b)    Over-the-counter options ("OTC options") which are by private contract between two private parties, are not listed on an exchange, and are not standardized.  The terms of an OTC option are individually negotiated, fulfillment is not guaranteed by the credit of any exchange, depends on the credit worthiness of the counter-party to avoid a default, and can only be exercised pursuant to the negotiated terms. In general, the counter parties to an OTC option are well-capitalized institutions.

86.    In contrast to the fact that most registered investment advisory firms (as the Madoff Firm was) use third-party custodians to protect against operational risk, the Madoff Firm required that it maintain custody of the securities in the accounts it traded and that custody not be with an independent custodian, raising questions about the integrity of the reported results and documents supplied by Madoff.

87.    The Sentry PPM states that "[a] significant portion of the options transactions effected [will] utilize the over-the-counter market. . [which] is subject to counter party risk. . . ."

(Sentry PPM at 16).   Any transaction in OTC option markets would have been made by a non-standard contract with the terms individually negotiated between the counter-parties and would have resulted in extensive documentation of the trades, counter-party risk and the specific terms of the transaction, but little or no documentation existed.  As a result all such OTC option agreements would have been more expensive than if placed in the S&P 100 Put & Call market and would have materially reduced profits because of the time required to negotiate and the fees involved and because the prices were not uniform.

**Red Flag No. 3.**

**The Evidence That the Madoff Firm Had A Proprietary System To Execute
The SSC Was Contradicted By The Trading Records Of the Madoff Firm**

88.      Despite claiming to have an automated order and execution process for the SSC and that Madoff's reputation was made as an early and enthusiastic proponent of electronic trading, many of the Madoff Firm's trades for Sentry were supported only by manual trade tickets and the Madoff Firm refused Citco or PWC access to his trading by computer (itself a Red Flag). Because the Madoff Firm was a broker dealer, it had the ability to generate whatever trading tickets it wanted, and because it maintained custody of the securities in the Sentry account there was no independent verification that such trading had actually occurred.

89.      Nevertheless, another Madoff Firm feeder fund controlled by Sentry, BBHF Emerald, Ltd ("Emerald"), and audited by PWC,  represented to investors that the Madoff Firm and Madoff utilized "proprietary models and algorithms and [a] sophisticated trade execution platform" and thus there should have been no need for paper tickets.

90.      The Madoff Firm refused to permit any "due diligence reviews" or "performance

audits" of his trading and results to verify the represented trading and results.

91.     Many of the individual trades reported by Madoff would have shown that they could not have taken place as represented in that many were at reported prices higher than the price that the security in question traded at for the entire day the trade was claimed to have been executed.

92.     The Financial Industry Regulatory Authority ("FINRA") has preliminarily suggested that there is no record of trades through the Madoff Firm for the fund accounts:  "Our exams showed no evidence of trading on behalf of the investment advisor, no evidence of any customer statements being generated by the broker-dealer," said Herb Perone, spokesman for FINRA.  If the foregoing is borne out, a proper and thorough review of trading in Sentry's account by Citco and/or PWC in execution of their responsibilities at the time would have determined this fact and thereby, discovered the Ponzi scheme.

**Red Flag No 4.**

## The Cash In the Sentry Account Did Not Exist

93.     Sentry represented that it "typically spends more than half of the trading days in each year exposed to movements in the S&P 100 Index [and for] the rest of the year [is in cash]." Confirmation of Sentry's trading and cash positions was materially easier and less expensive to verify than a typical trading strategy because the number of trades would have been materially less and in publically traded securities or cash.

94.     A review of where the cash for Sentry was placed would have shown that it was reported to be in accounts and/or T-bills that did not exist.  For example, some of Madoff's brokerage statements showed transactions in Fidelity Investments' Spartan Fund, however,

Fidelity had no investments by Madoff in its funds on behalf of his clients and neither Madoff

nor his firm was a client of Fidelity's Institutional Wealth Services business, their clearing firm

National Financial or a financial intermediary client of its institutional services arm.

95.     Before the calculation and issuance of NAVs, Sentry's books had to be reconciled

with the results reported by the Madoff Firm and any discrepancies resolved which required both

a cash reconciliation and a position reconciliation.  A cash reconciliation requires the comparison

of the record of Sentry's cash movements in and out of the account with the Madoff Firm's

record of cash movements.  Each difference is called a "cash break."  Position reconciliations

require a comparison of Sentry's positions in its portfolio (*i.e.*, securities, contracts, puts and

calls, *etc.*) with the Madoff Firm's trading record.  Each difference is called a "position break".

If such reconciliations had taken place, they would have revealed material cash and position

breaks.

**Red Flag No. 5.**

**If Securities Lending Had Been Verified, It Would Have Shown No Lending**

96.     The Sentry PPM states that Sentry through the Madoff Firm may lend its portfolio

of securities and that Sentry was to obtain interest on such loans.  Any review of the securities

lending would have required an analysis of transmissions to borrowers of the identity of

customers who had lent the securities and an analysis of operational risk which would include

settlement, monitoring and billing.

97.     Any review of securities lending would have revealed that no securities were

being loaned because there were not sufficient securities in the account or that lending was not

being done thus forgoing a significant amount of income, or to the extent it was being under-

taken, the portfolio was at material risk.

**Red Flag No. 6**

**The Results Reported By the Madoff Firm Were At Odds With the Results Of Other Firms Using the Same Trading Method**

98.    Madoff was reporting abnormally stable and high investment returns.

99.    Studies of Madoff's strategy by persons experienced in this area (as PWC and Citco represented themselves to be) have shown that:

> assuming that the split-strike conversion strategy was implemented within the confines of market liquidity (~ 3% of Madoff's actual AUM), that the true volatility would have been seven times higher than that reported by Fairfield Sentry of the Madoff trading results

> While a portfolio manager with consistently average or median stock picking aptitude could, in theory, have actually delivered an 18-year cumulative return that exceeded that of both the S&P-500 outright and a 5% OTM collared S&P-500 position, the flip side is the volatility needed to incur in order to generate these returns, making it impossible to deliver returns claimed by Madoff, while incurring the low volatility reported by Madoff and Greenwich Sentry.

> Collared strategies do not typically have Sharpe ratios[1] that are nearly an order of magnitude higher than that of the asset underlying the options used. Over the last 18 years, for example, the S&P-500 had a Sharpe ratio of 0.43. By comparison, the Sharpe ratio for an average split-strike conversion strategy would have been 0.55. As one writer has said "the calculation of a Sharpe ratio, should therefore serve as the first and easy sanity check to gauge the validity of any collared strategy."

> Despite the growth in the volatility market over the last decade, the

---

[1]    The Sharpe Ratio is a risk-adjusted measure of performance. The ratio compares the return of the portfolio to the risk-free rate as well as the risk generated by the portfolio. It is calculated by taking the return of the portfolio and subtracting the risk-free rate of return. The result is then divided by the standard deviation of the portfolio.

markets would only have been able to accommodate ~$1.5B in
short-dated options trades before incurring severe market impact.

Credit Suisse, "Split Strike Conversions, How Madoff Should Have Made Out," January 14,
2009.

100.    Other investment advisors and financial publications had publically stated that the
Madoff Firm's trading results could not be replicated based on the model he was purportedly
using.

101.    The trading results reported by the Madoff Firm were not consistent with
publically traded funds that followed the same trading strategy, all of which had much lower
returns and greater volatility than reported by the Madoff Firm.

102.    Other investment advisors that invested funds with the Madoff Firm, including at
least one audited by PWC, had stated to its investors that assets invested with Madoff could have
"misappropriated" funds and "information supplied by the Madoff Firm may be inaccurate or
even fraudulent".

**Red Flag No. 7.**

**<u>The Auditor's Report For the Madoff Firm Could Not Be Relied Upon</u>**

103.    Madoff Securities International, Ltd ("MSI")  -- a Madoff Firm affiliate in
London -- was audited by KPMG (UK), one of the big four accounting firms, despite the fact that
the business of the Madoff Firm dwarfed that of MSI, while the financial statements of the
Madoff Firm were audited each year by a three person accounting firm -- Friehling & Horowitz
("F&H").

104.    Under the regulations of the American Institute of Certified Public Accountants

-39-

("AICPA") every accounting firm that does auditing work is required to enroll in the AICPA's peer review program under which experienced auditors assess such firm's audit quality yearly. While F&H was a member of the AICPA, it had not been subjected to a peer review since 1993 because F&H had represented to the AICPA, in writing, that it did not perform any audits. Whether a firm has been subject to a peer review, and the results of that review, are on public file at the AICPA. There was no basis for PWC or Citco, in the circumstances, to conclude that: a) the work of F&H was acceptable based on knowledge of the professional standards and competence of F&H, or that b) the work F&H had performed was not material in relation to matters at issue.

105.    Nevertheless, neither took sufficient steps to obtain satisfaction as to the audit performed by F&H, including, but not limited to:

      (a)    visiting F&H to discuss the audit procedures followed and results thereof;

      (b)    reviewing the audit programs and/or working papers of F&H; or

      (c)    gaining an understanding of the internal control structure and the assessment of control risk of the Madoff Firm.

106.    The audited financial reports filed by the Madoff Firm with the SEC represented that certain information was attached to the report, but it was not attached, including but not limited to F&H's report on the Madoff Firm's internal accounting controls.

**Red Flag No. 8**

**The Manner In Which Profits Were Divided Between**
**the Madoff Firm And the Feeder Funds Was Irrational**

107.    Unlike any other hedge fund and/or investment advisor, the Madoff Firm claimed

to make its profits solely from commissions generated from trading which trading took place during limited periods of time and not consistently. As a result the Madoff Firm forewent any part of the incentive fees being generated.

108. Moreover, Madoff went to cash in Sentry's account near year end and thus had no open positions, which was highly unusual and which resulted in the closing out of "profitable" positions.


## G.   CITCO'S FAILURES

109. Citco had specialized knowledge, expertise and experience in fund administration, and had access to public and non-public information with respect to fund administration, Sentry, and the Madoff Firm.

110. Citco failed to exercise due care and diligence and was reckless and/or grossly negligent in its administration of Sentry and Plaintiff's funds, and in breach of its duties to Sentry and its Limited Partners including Plaintiff, in numerous ways, including *inter alia*:

> (a)    Citco failed to investigate and/or appreciate the significance of, the Red Flags, singly, multiply, or in combination, so as to recognize that the Madoff Firm was engaging in a Ponzi scheme to the detriment of Plaintiff.
>
> (b)    Citco failed to advise Plaintiff and the other Limited Partners of the existence and importance of the Red Flags.
>
> (c)    Citco failed to investigate and confirm the accuracy of the purported account statements of the Madoff Firm for Sentry and its Limited Partners, including Plaintiff.

(d)     Citco failed to investigate and confirm the accuracy of representations by the Madoff Firm as to trades it represented it had made on behalf of Sentry and the Limited Partners, including Plaintiff.

(e)     Citco failed to investigate and confirm the accuracy of representations by the Madoff Firm as to the status of Plaintiff's and other Limited Partners' funds.

(f)     Citco failed to accurately calculate the NAVs and/or capital account balances of the Limited Partners, including Plaintiff.

(g)     Citco prepared, disseminated and/or approved account statements, NAVs, fund reports and other documents to Sentry, Plaintiff and the other Limited Partners which materially misstated and overstated the funds remaining in the accounts of Sentry, Plaintiff and the other Limited Partners, and in the exercise of care and due diligence would have not done so.

(h)     Citco failed to advise Plaintiff and the other Limited Partners of Sentry that the Madoff Firm was engaging in a Ponzi scheme, and that it and Sentry was or would become insolvent.

(i)     Citco failed to advise Plaintiff and the other Limited Partners of Sentry that capital of newer Limited Partners was being used to pay other (particularly earlier-investing) Limited Partners their "capital" and stated "profits" and "appreciation".

(j)     Citco failed to investigate and confirm whether the information received from, and representations made by, the Madoff Firm were accurate.

(k)     Citco failed to determine whether the obligations of the Madoff Firm to

-42-

Sentry and its Limited Partners were being fully, accurately and honestly dis-

charged.

(l)       Citco permitted Sentry to have the Madoff Firm act as both broker for and

custodian of the Limited Partners' funds and knew this was a material operational

risk.

(m)      Citco entrusted the Limited Partners' funds to the Madoff Firm.

(n)       Citco permitted Sentry to disseminate information to its Limited Partners,

including Plaintiff, which contained materially incorrect information as to the

status of their funds, the success of the Fund's investment strategy, and the

reliability of the controls and oversight of the Madoff Firm.

(o)       Citco failed to comply with its own internal and published standards for

oversight and control of the broker and custodian of the Limited Partners' funds,

i.e., the Madoff Firm.

(p)       Citco failed to maintain true and accurate financial books and records of

Sentry.

(q)       Citco failed to accurately calculate and administer distributions of "capi-

tal", "profits" and "appreciation" to Limited Partners.

(r)       Citco failed to accurately communicate with Sentry, its Limited Partners,

and others.

(s)       Citco failed to accurately supervise the payment of Sentry's expenses,

including its fees owed to others.

-43-

H.    **PWC'S FAILURES**

111.    PWC had specialized knowledge, expertise and experience in auditing and accounting with respect to funds such as Sentry, and had access to public and non-public information with respect to practices in performing those functions, and as to the operation and results of Sentry, and the Madoff Firm.

112.    PWC failed to exercise due care and diligence, and/or was grossly negligent and reckless, in conducting its examination of Sentry and Plaintiff's funds in numerous ways, including *inter alia*:

(a)    PWC failed to conduct its audit in accordance with the standards of GAAS, including without limitation those set forth above.

(b)    PWC failed to present Sentry's financial statements in accordance with principles of GAAP, including without limitation those set forth above.

(c)    PWC failed to investigate and/or resolve the Red Flags.

(d)    PWC failed to advise Sentry, Plaintiff and the other Limited Partners of the existence and importance of the Red Flags.

(e)    PWC failed to investigate and confirm the accuracy of representations by the Madoff Firm as to trades it claimed it had made on behalf of Sentry and the Limited Partners, including Plaintiff.

(f)    PWC failed to investigate and confirm the accuracy of representations by the Madoff Firm as to the status of Plaintiff's and other Limited Partners' funds.

(g)    PWC failed to advise Plaintiff and the other Limited Partners of Sentry that the Madoff Firm was engaging in a Ponzi scheme, and that it and Sentry was

or would become insolvent.

(h)     PWC failed to advise Plaintiff and the other Limited Partners of Sentry that capital of newer Limited Partners was being used to pay other (particularly earlier-investing) Limited Partners their "capital" and stated "profits" and "appreciation".

(i)     PWC failed to determine whether the obligations of the Madoff Firm to Sentry and its Limited Partners were being fully, accurately and honestly discharged.

(j)     PWC knew that to have the Madoff Firm act as both broker for and custodian of the Limited Partners' funds increased operational risks but did not extend its audit procedures.

(k)     PWC permitted Sentry to disseminate information to its Limited Partners, including Plaintiff, which contained materially incorrect information as to the status of their funds, the success of the Fund's investment strategy, and the reliability of the controls and oversight of the Madoff Firm and permitted the name of PWC to be associated therewith.

(l)     PWC failed to comply with its own internal and published standards for oversight and examinations.

(m)     PWC issued unqualified reports which, inter alia, attested to the accuracy of Sentry's financial statements and NAVs, which in turn were materially misleading and overstated as alleged herein.

(n)     PWC transmitted, and/or permitted the transmission of, those unqualified

-45-

reports to the Limited Partners, including Plaintiff.

(o)     PWC failed to satisfy the minimum acceptable standards of professional conduct in each of its audits of Sentry, including but not limited to GAAS, and failed to ensure that Sentry's financial statements were presented consistent with GAAP, and but for those failures the Ponzi scheme would not have been able to continue.

(p)     PWC failed to perform sufficient fieldwork by neglecting to obtain competent evidence to afford it a reasonable basis for forming an opinion regarding Sentry's financial statements but regularly issued unqualified audit opinions.

(q)     PWC could not accept assurances at face value and was required to conduct itself at all times with a high degree of professional skepticism and with an independence in mental attitude and failed to do so.

(r)     PWC failed, contrary to GAAS requirements, to satisfy itself that Sentry had implemented adequate safeguards in the face of clear operational risk, and clear "red flags" for auditors to consider that PWC knew and/or consciously avoided knowing were present in this case, including those heretofore alleged;

(s)     PWC failed to consider, and/or appreciate the significance of, any unusual or unexpected relationships identified and to understand the entity's business and the industry in which it operates.  Approximately 95% of Sentry's assets were in the custody of and traded by Madoff, who reported the trading results.  In this circumstance neither a confirmation in the aggregate nor on a security-by-security basis by the Madoff Firm is adequate audit evidence of the existence of either the

assets in or the results of trading in the Sentry account.

113.    The member firms of PWC Int'l, including PWC, share information and services with respect to clients and/or common issues affecting auditing and services provided.  This is done in aid of rendering more complete services and to protect PWC Int'l members against, and/or reduce the risk of, potential claims.  Pursuant thereto, PWC and the other member firms of PWC Int'l shared information and/or had access to each other's information with respect to the Madoff Firm and regarding their respective clients' relationships with the Madoff Firm.  Such information in the possession of PWC's sister offices included at least the following:

> (a)    the Kingate Global fund which was audited by PWC's sister office, and which was a feeder fund for Madoff, had stated in its PPM that "there is a risk that the custodian could abscond with those assets . . .[and] information supplied by [Madoff] may be inaccurate or even fraudulent."; and

> (b)    PWC sister office in its opinion on the 2007 financial statements of the Optimal Fund, managed by Bank Santander, went so far as to "draw to your attention" the fact that Mr. Madoff held all the securities, such that PWC advised the investors of a specific and significant operational risk.

114.    PWC failed to disclose and or resolve these material warnings put forth by other clients of its sister firms and by the sister firm's themselves  and in the footnotes to the Sentry financial statements noted only items of investment risk and omitted all mention of operational risk.  If PWC had made proper disclosure of facts that its own sister offices made and/or approved, it would have led Plaintiff to realize that its funds were at risk and Plaintiff would not have made  its investment in and thereafter continued its investment in Sentry.  These failures

were material and in violation of GAAS and GAAP. In the face of the information in its possession, PWC had an affirmative obligation to either materially extend its audit procedures in order to issue an unqualified report or issue a qualified reports. PWC had obligations to investigate, resolve or report on the knowledge and reports concerning the Madoff Firm in the possession of PWC and its sister offices. PWC failed to meet these obligations and instead issued unqualified reports on Sentry's financial statements.

115.    An audit properly performed in accordance with GAAS easily would have uncovered the Ponzi scheme alleged herein.

## COUNT I

## BREACH OF FIDUCIARY DUTY AGAINST THE CITCO DEFENDANTS

116.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein and further alleges as follows.

117.    Plaintiff reposed confidence in Citco as to the duties it undertook with respect to Sentry and Plaintiff's funds and were induced by Citco to do so.

118.    Citco possesses superior information as to the status, use and trading of Plaintiff's funds, and was in a superior position to assess the status, use and trading of Plaintiff's funds. As a result, Plaintiff was required to repose trust confidence in Citco.

119.    Citco held itself out to the public and to Plaintiff as having superior information and skills with respect to administration of Sentry and funds of its type and with respect to valuation of NAVs of Sentry and funds of its type. The reported NAVs and financial statements were figures within the control of Citco and PWC and were the only measures by which limited

-48-

partnership interests in Sentry could be evaluated and purchased and therefore Plaintiff is entitled to a presumption of reliance.

120.    As part of its duties as fund administrator, and in furtherance of its superior information and skills, Citco had responsibility for communicating with Sentry's Limited Partners, including Plaintiff, and as part of its communications Citco made representations directly to the Limited Partners attesting to the quality of its services.

121.    In undertaking to fulfill its contractual responsibilities with respect to the books, records, accounts and NAVs of Sentry and the Limited Partners including Plaintiff, Citco was vested with discretion in its methods and standards, and was obligated to use its best efforts, extreme due care, and independent judgment on behalf of Sentry and the Limited Partners.

122.    Citco held itself out to the public and to Plaintiff as a fiduciary when acting as administrator of Sentry or a fund of its type.

123.    Citco knew that the Limited Partners of Sentry including Plaintiff would rely upon it for its best efforts, extreme due care, and independent judgment, particularly in confirmation, valuation and review of NAVs and reporting trading results.

124.    As the fund administrator of Sentry, Citco was as a matter of law a fiduciary to Plaintiff.

125.    By virtue of the foregoing, Citco was a fiduciary to Plaintiff.  It therefore had a duty to Plaintiff to:  deal fairly and honestly with Plaintiff; act with utmost loyalty and good faith toward Plaintiff; and manage, safeguard and verify Plaintiff's funds in the best interest of Plaintiff.

126.    Plaintiff placed trust and confidence in Citco, and relied upon Citco as the

administrator of Sentry to independently confirm and verify the trading results and NAV of its account.  In light of Citco's superior information and skill, its undertaking to so act, and the other matters alleged herein, this trust, confidence and reliance was foreseeable and reasonable.

127.    By virtue of the failures alleged herein, Citco breached its fiduciary duties to Plaintiff.

128.    Plaintiff has been damaged by the wrongful conduct of Citco in that it was induced to purchase and/or hold shares in Sentry, and as a result the value of Plaintiff's $60 million investment has been completely or substantially destroyed and Plaintiff has lost all, or substantially all, of its investment.  If Citco had not acted in manner alleged above, and had not failed to detect and/or advise Plaintiff of the Ponzi scheme as alleged above, and/or had not issued the materially inaccurate NAVs of Sentry and Plaintiff's funds which it did, Plaintiff would not have suffered its loss.

129.    As is alleged above, Citco failed to follow its own stated policies of independent review of valuations and proceeded in the face of known dangers without any meaningful attempt to reconcile obvious and material discrepancies regarding Sentry's portfolio and Plaintiff's investment.  As is alleged above, Citco was reckless in that it failed to review conflicting information that it had a duty to reconcile and monitor, and unreasonably ignored or recklessly failed to detect or appreciate the significance of the Red Flags.

130.    Plaintiff is entitled to an award of compensatory damages against Citco in an amount to be determined at trial.

131.    As a fiduciary and trustee, Citco is liable to Plaintiff not only for its losses, but for any gains which Citco received while acting as fiduciary.  Citco is liable to Plaintiff for any fees

it received in its role as administrator and/or sub-administrator of Sentry.

132.   Owing to the flagrant nature of its conduct as outlined herein, Citco is liable to Plaintiff for punitive damages of not less than three times the compensatory damages awarded.

## COUNT II

### GROSS NEGLIGENCE AGAINST THE CITCO DEFENDANTS

133.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein and further alleges as follows.

134.   As is more fully set forth above, Citco had a special relationship with Plaintiff giving rise to a duty to exercise due care and diligence with respect to the administration and safeguarding of Plaintiff's funds, including without limitation a duty to independently confirm, value and report on the NAVs of Sentry and the Limited Partners including Plaintiff.  The reported NAVs and financial statements were figures within the control of Citco and PWC and were the only measures by which limited partnership interests in Sentry could be evaluated and purchased and therefore Plaintiff is entitled to a presumption of reliance.

135.   As is alleged above, Citco knew or should have known that Plaintiff was relying upon it to fulfill those obligations with reasonable care, including without limitation a duty to independently confirm, value and report on the NAVs of Sentry and the Limited Partners including Plaintiff.

136.   Plaintiff foreseeably and reasonably relied on Citco to fulfill its obligations with reasonable care, by entrusting its funds to Citco and allowing its funds to remain in Sentry for administration by Citco.

137.   For the reasons alleged above, Citco woefully failed to exercise due care and diligence in the administration and safeguarding of Plaintiff's funds.

138.   Plaintiff was injured by Citco's woeful failure to exercise due care and diligence. If Citco had exercised its duties with due care, Citco would have discovered and advised Plaintiff of the infirmities alleged above, and Plaintiff either would not have invested funds in Sentry or would have withdrawn them promptly upon being so advised.

139.   Citco did not utilize the requisite skill and knowledge to perform their duties, woefully failed to exercise ordinary and reasonable care in the application of their professional knowledge and skill, and woefully failed to use their best professional judgment in the application of their knowledge and skill.  Citco woefully failed to inquire into many crucial facts, which, in the exercise of ordinary care, they should not have ignored and should have investigated. Citco demonstrated a complete disregard for the rights of Plaintiff and the security of its investment.

140.   As is alleged above, Citco breached its duties of due care and was grossly negligent.

141.   As is alleged above, Plaintiff has suffered damage as a proximate result of the breaches and gross negligence by Citco.

142.   Plaintiff is entitled to an award of compensatory damages against Citco in an amount to be determined at trial.

## COUNT III

## GROSS NEGLIGENCE AGAINST PWC

143.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein and further alleges as follows.

144.    As is more fully set forth above, PWC had a close relationship with Plaintiff approaching that of privity.  PWC intentionally issued and caused to be delivered audited reports to each Limited Partner of Sentry, including Plaintiff.  PWC was aware and intended that each Limited Partner of Sentry, including Plaintiff, would rely on PWC's audits and other reports in making investment decisions with respect to investments in Sentry.  The reported NAVs and financial statements were figures within the control of Citco and PWC (whose opinion was required in order to transmit these document to the Limited Partners) and were the only measures by which limited partnership interests in Sentry could be evaluated and purchased and therefore Plaintiff is entitled to a presumption of reliance.  This relationship gave rise to a duty to exercise due care and diligence with respect to PWC's obligations to Plaintiff to audit Sentry's books and records in accordance with GAAS and GAAP.

145.    The audit reports prepared by PWC were specifically addressed and distributed to the Limited Partners of Sentry, including Plaintiff, and PWC intended that Plaintiff rely thereon.

146.    Plaintiff foreseeably and reasonably relied on PWC to fulfill its obligations with reasonable professional care by trusting PWC to exercise due care and diligence in performing its audits and by allowing its funds to remain in Sentry in reliance on those audits.  PWC knew that Plaintiff would rely upon its audits and that Plaintiff did so in purchasing and then maintaining its investment with Sentry and in determining whether or not to redeem its interest in Sentry.

147.    For the reasons alleged above, PWC woefully failed to exercise due care and diligence and departed from accepted accounting and auditing standards of practice in the conduct of its audits, failed to utilize the requisite skill and knowledge to perform its duties as auditor, failed to exercise ordinary and reasonable care, and negligently failed to use proper professional judgment in the application of its knowledge and skill. PWC woefully failed to perform duties with the due and professional care required of the accepted standards of practice of an experienced auditor.

148.    Plaintiff was injured by PWC's woeful failure to exercise due care and diligence and by PWC's departure from the accepted standards of accounting and auditing practice. If PWC had exercised its duties with due care and conformed with accepted standards of practice, PWC would have discovered and advised Plaintiff of the infirmities alleged above, and Plaintiff either would not have invested funds in Sentry or would have withdrawn its investment promptly upon being so advised.

149.    PWC did not utilize the requisite skill, knowledge, and accepted standards of practice to perform their duties, woefully failed to exercise ordinary and reasonable care in the application of their professional knowledge and skill, and woefully failed to use their best professional judgment in the application of their knowledge and skill. PWC failed to inquire into many crucial facts, which, in the exercise of ordinary care, they should not have ignored and should have investigated. PWC demonstrated a complete disregard for the rights of Plaintiff and the security of its investment.

150.    As is alleged above, PWC breached its duties of due care and was grossly negligent.

151.    As is alleged above, Plaintiff has suffered damage as a proximate result of the breaches and gross negligence by PWC.

152.    Plaintiff is entitled to an award of compensatory damages against PWC in an amount to be determined at trial.

## COUNT IV

## THIRD PARTY BENEFICIARY AGAINST CITCO AND PWC

153.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein and further alleges as follows.

154.    Each of Citco and PWC entered into a contract with Sentry to perform services respectively as fund administrator and auditor/accounts for Sentry as more fully alleged above, including but not limited to the preparation of NAVs, the auditing of financial statements and/or the preparation of other financial reports. Under each of the respective contracts between Sentry and Citco and PWC, the Limited Partners of Sentry, including Plaintiff, were intended third party beneficiaries of the services to be provided by Citco and PWC.

155.    As more fully alleged above, Citco and PWC each breached their respective contracts causing injury to Plaintiff. In breaching their respective contracts, Citco and PWC have caused damage to Plaintiff in a way that was directly foreseeable by each of them.

156.    As is alleged more fully above, Citco and PWC each was in a close relationship with Plaintiff approaching that of privity. As is alleged more fully above, Citco and PWC each intentionally sent information to Plaintiff, including but not limited to audited financial reports or statements, monthly reports and/or NAVs to each Limited Partner of Sentry, including Plaintiff.

-55-

Citco and PWC were each aware and intended that each Limited Partner of Sentry, including Plaintiff, would rely on Citco's NAVs, PWC's audits and/or other reports prepared and sent by Citco and PWC pursuant to their contracts with Sentry in making investment decisions with respect to investments in Sentry.  The reported NAVs and financial statements were figures within the control of Citco and PWC and were the only measures by which limited partnership interests in Sentry could be evaluated and purchased and therefore Plaintiff is entitled to a presumption of reliance.

157.    Plaintiff is entitled to an award of compensatory damages against Citco and PWC in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands as follows:

    (a)    a trial by jury on all counts;

    (b)    granting judgment:

        (i)    on Count I against Citco for compensatory damages and not less than three times that amount as punitive damages as are determined at trial;

        (ii)    on Counts II and III against Citco and PWC for compensatory and consequential damages as determined at trial;

        (iii)    on Count IV against Citco and PWC for compensatory and consequential damages as determined at trial; all together with

    (c)    for reasonable attorneys fees and expert witness fees, costs, and disbursements of this action; and

    (d)    such other and further relief as this Court deems just and proper.

Dated:  New York, New York
         January 26, 2009

                DEUTSCH, METZ & DEUTSCH, LLP
                Attorneys for Plaintiff

                By _____
                   Herbert I. Deutsch (HD3391)
                18 East 41st Street, Sixth Floor
                New York, New York  10017
                (212) 684-1111