UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

G. PHILIP STEPHENSON, as Trustee of the
PHILIP STEPHENSON REVOCABLE LIVING
TRUST,

                                   Plaintiff,

            -against-                                             09 CV 00716 (RJH)

                                                                  **MEMORANDUM OPINION
                                                                  AND ORDER**

CITCO GROUP LIMITED; CITCO FUND
SERVICES (EUROPE) BV; CITCO (CANADA),
INC.; and PRICEWATERHOUSECOOPERS, LLP
(an Ontario limited liability partnership),

                                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Richard J. Holwell, District Judge:

        The parties are individuals and entities who, like most of the country, were

unaware until December 2008 that Bernie Madoff was operating a Ponzi scheme.[1,2]

Unlike most of the country however, the parties had the misfortune of being directly

involved.

        The plaintiff is G. Philip Stephenson, the trustee and namesake of the Philip

Stephenson Revocable Living Trust, which invested $60 million as a limited partner in a

---

[1] One notable exception is Harry Markopolos, a now famous Madoff whistle-blower who was
reportedly aware of the fraud much earlier. *See Assessing the Madoff Ponzi Scheme Before the H.
Comm. on Financial Services*, 111th Cong. (2009) (statement of Harry Markopolos, Chartered
Financial Analyst and Certified Fraud Examiner), http://
www.house.gov/apps/list/hearing/financialsvcs_dem/markopolos020409.pdf.

[2] At the risk of stating the already well known, a Ponzi scheme is a fraudulent investment fund
that generates the false appearance of profit by paying early investors out of the money invested
by subsequent investors. The name comes from Charles Ponzi, an early 20th century fraudster
who famously abused this practice.

fund called Greenwich Sentry.  Greenwich Sentry in turn invested most of its assets with

Bernie Madoff Investment Securities (BMIS), the fake fund through which Madoff

perpetrated his multi-billion dollar fraud.  Greenwich Sentry is not a party to this action,

but as one of a number of so-called "feeder funds" provided a vehicle for plaintiff

(among others) to invest with BMIS.  Greenwich Sentry had as its administrator

defendant Citco (Canada) Inc., and as its sub-administrator defendant Citco Fund

Services (Europe) Inc.[3]  Finally, defendant PricewaterhouseCoopers Canada ("PWC")

was Greenwich Sentry's independent auditor.[4]

Plaintiff has never received back a penny of the $60 million that his trust invested

in BMIS through Greenwich Sentry.  As a result of that loss he has brought this direct

action against Greenwich Sentry's administrators and its independent auditor.[5]  The

Complaint[6] features seven state law claims: (I) breach of fiduciary duty against Citco, (II)

---

[3] Defendant Citco Group Limited is a third Citco entity which has a relationship with Citco (Canada) and Citco Fund Services (Europe) that the Court need not delve into because it is granting the parties' pending motions to dismiss on unrelated grounds.  The Court appreciates that there are important differences between the Citco entities.  However because those differences are immaterial to the Court's decision to dismiss the Complaint, the Court does not reach Citco Group Limited's agency liability arguments and refers to the Citco defendants collectively as "Citco" throughout.

[4] Stephenson is a Texan and the Stephenson Trust is formed under the laws of the State of Texas. (Cl. ¶ 18.)  The defendants are not Texans: Citco Group is a citizen of the Cayman Islands-British West Indies; Citco Europe is a citizen of the Netherlands; Citco Canada is a citizen of Canada; and PWC Canada is a citizen of Canada.  (*Id.*)  The amount in dispute, $60 million, is greater than $75,000.  Accordingly the Court has diversity jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1332(a).

[5] Greenwich Sentry itself, as well as each of the defendants here, are parties to a large consolidated action before Judge Marrero, *Anwar et al. v. Fairfield Greenwich Limited, et. al.*, Docket No. 09 CV 00118, Master File No. 09CV0118.  That action includes class claims and, upon initial reading of the consolidated amended complaint therein, Stephenson appears to be a member of at least one of the purported classes.

[6] The Court refers to the July 2, 2009 corrected amended complaint as "Complaint" throughout this opinion.  Stephenson filed his initial Complaint on January 26, 2009, and it was subsequently

gross negligence against Citco, (III) negligence/professional malpractice against PWC, (IV) fraud against PWC, (V) breach of contract (third party beneficiary) against Citco, (VI) breach of contract (third party beneficiary) against PWC, and (VII) aiding and abetting breach of fiduciary duty, against Citco and PWC.

The defendants have filed three separate motions seeking to dismiss the complaint in its entirety.  ([38], [43], and [46].)  With respect to plaintiff's breach of fiduciary duty, gross negligence, negligence, and aiding and abetting breach of fiduciary duty claims, defendants assert preemption by the Martin Act, New York's blue sky law.  With respect to plaintiff's fraud claim, PWC contends that the Complaint does not plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b).  With respect to all claims, defendants assert that (1) they are derivative and cannot be brought directly by Stephenson, and (2) they are not adequately plead and should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons that follow the Court finds that plaintiff's first, second, third, and seventh causes of action are preempted by the Martin Act, and that his first, second, third, fifth, sixth, and seventh causes of action are derivative and cannot be brought directly. The Court also finds that plaintiff's fourth claim, alleging fraud against PWC, has not been plead with an adequate allegation of scienter.  Accordingly the Court dismisses plaintiff's complaint in its entirety.

## I. BACKGROUND

The factual allegations in the Complaint are as follows:

---

referred to this Court on February 17, 2009 [3].  Plaintiff filed an amended complaint [36] on June 29, 2009, and filed a corrected amended complaint [37] on July 2, 2009.

**1.  The parties and other relevant entities**

Several non-parties (other than, of course, BMIS) had important roles in the facts underlying the complaint.  Most central among them is Greenwich Sentry, the Madoff feeder fund that connects plaintiff to the defendants.  Greenwich Sentry operates principally out of New York, where its offices are located.  (Cl. ¶ 6.)  Greenwich Sentry was set up by Fairfield Greenwich Group, a Delaware limited liability company that operates principally out of New York, and which also set up a number of Madoff feeder funds similar to Greenwich Sentry.  (Cl. ¶¶ 6-7.)  Fairfield Greenwich's "core product business model is the investment management and oversight of the split strike conversion strategy, implemented through [the feeder funds]," and Fairfield Greenwich made substantial representations as to the extent and quality of its due diligence in that capacity.  (Cl. ¶¶ 31-38.)

Greenwich Sentry operated as a "feeder fund," placing substantially all of its Limited Partners' investments into a brokerage account in the custody of Madoff, who acted as trader, broker, and custodian of all funds and securities in the account.  (Cl. ¶ 26.)  Madoff reported account data and trading results back to Greenwich Sentry, which were in turn handed over to Greenwich Sentry's administrator and auditor to process reports.  (Cl. ¶ 26.)

The limited partners bought shares of Greenwich Sentry, which in turn invested in BMIS.  They could withdraw funds monthly by placing requests directly with Greenwich Sentry, which would either pay them out of a separate account that it maintained for the purpose of monthly adjustments, (Cl. ¶ 27), or forward the requests to BMIS which

would send back the funds for distribution.  In December 2008 when the Ponzi scheme

was disclosed, Greenwich Sentry ceased honoring withdrawal requests.  (Cl. ¶ 29.)

The Citco defendants acted in various capacities as Greenwich Sentry's hedge

fund administrators.  According to the complaint, Citco Group Limited (CGL) is an

integrated financial services holding company that includes among its subsidiaries Citco

(Canada), Inc. and Citco Fund Services (Europe) BV.  (Cl. ¶ 8.)  Operating solely

through its subsidiaries, CGL represents itself and its subsidiaries as the world's top

providers of hedge fund administration services.  (Cl. ¶ 11.)  CGL explains these services

on its web site:

> Our Hedge Fund Service offering includes fund accounting and net asset
> value calculations, investor relations services, anti-money laundering
> compliance, corporate & legal services, … tax reporting and financial
> statement preparation.  Citco's online reporting tools, … offer both
> investment managers and investors an extensive suite of online reports to
> provide them with the tools they need to operate efficiently and effectively.
> Citco also offers a complete front-to-back offering for single manager
> funds, combining portfolio capture and real-time position monitoring
> technology … with middle and back office operations support.  (Cl. ¶ 12.)

Citco (Europe) Inc. is a Netherlands limited liability company and wholly owned

subsidiary of CGL that operates principally out of Amsterdam.  (Cl. ¶ 9.)  It has been

Greenwich Sentry's fund administrator since September 1, 2006.  (Cl. ¶ 9.)  Citco

(Europe) was primarily responsible for: communicating with limited partners,

maintaining a record of accounts, processing subscriptions and withdrawals, preparing

and maintaining financial and accounting records and statements, calculating account

balances, arranging for the provision of accounting, clerical, and administrative services,

and maintaining corporate records.  (Cl. ¶ 49.)

Citco (Canada) Inc. is a Canadian corporation and wholly owned subsidiary of CGL that operates principally out of Ontario, Canada. (Cl. ¶ 9.) Citco (Canada) was delegated by Citco (Europe) to function as sub-administrator of Greenwich Sentry. (Cl. ¶ 10.) It has done so since September 2006. (*Id.*)

The Citco entities issued reports as to Greenwich Sentry's portfolio and limited partners' NAV valuations, which they represented they would verify and investigate through due diligence applying their substantial expertise in that area. (Cl. ¶ 45.) They held themselves out as a fiduciary to the investors of the funds they administered. (Cl. ¶ 46.) According to their website:

> By providing fully independent services, we act as a reliable fiduciary to safeguard the interests of investors. We train our staff to provide specialist accounting and valuation support, investor relations, corporate services, and day to day management. (Cl. ¶ 46.)

PricewaterhouseCoopers, LLP (PWC) is an Ontario limited liability partnership, (Cl. ¶ 14), and a member firm of PricewaterhouseCoopers International, which operates a network of inter-connected member firms providing auditing, accounting and other investment and advisory services across an international platform, maintaining centralized control over information, training, standards of care, marketing, and quality of work. (Cl. ¶ 15.) The network of PricewaterhouseCoopers entities hold themselves out and operate as a unified business entity comprising a leading accounting and auditing firm with specialized expertise in hedge funds and investment vehicles. (Cl. ¶ 15; Cl. ¶ 60.) Defendant PWC was the auditor of Greenwich Sentry from 2006 through 2008. (Cl. ¶ 16.) It conducted an annual audit of Greenwich Sentry, (Cl. ¶ 63), for the purposes of which it was given complete access to Greenwich Sentry's records. (Cl. ¶ 65.) It annually issued an unqualified audit report, with the salutation "To the Partners of

Greenwich Sentry, L.P." attesting to the accuracy of Greenwich Sentry's financial statements.  (Cl. ¶ 63.)  In preparing this report PWC undertook to "prepare an annual audited financial report setting forth a balance sheet of Greenwich Sentry, a profit and loss statement showing the results of operations of Greenwich Sentry and its net capital appreciation or net capital depreciations, a statement of such Partner's closing capital account and the manner of its calculation and the Partner's opening capital account and partnership percentage for the then current fiscal year."  (Cl. ¶ 98.)

Plaintiff decided to invest with Greenwich Sentry (and in turn BMIS) in early 2008.  On February 20, 2008, Stephenson received documents about one of Greenwich Sentry's sister funds, Fairfield Sentry, and was told that the documents for Greenwich Sentry were similar but not then available.  The documents he received included a Fairfield Sentry Private Placement Memorandum, a powerpoint presentation, two "tearsheets" of initial performance data for Fairfield Sentry, and a due diligence questionnaire that described the roles of Citco and PWC in Fairfield's funds.  (Cl. ¶ 106.) On February 27, 2008, plaintiff received a "return attribution analysis" showing net profits for Fairfield Sentry of 9.38% in 2006 and 7.34% in 2007, with the understanding that the figures would be applicable to Greenwich Sentry because they represented the returns generated by BMIS.  (Cl. ¶ 107.)

In March 2008 plaintiff received an estimated monthly fund report for Greenwich Sentry showing a gain in February 2008, a Greenwich Sentry Limited Partnership Agreement, its PPM, and a Subscription Agreement.  (Cl. ¶ 108.)  The Greenwich Sentry PPM, dated August 2006, described how the Limited Partners' funds would be invested: it described the split strike conversion strategy, and explained that the strategy was

"implemented by Benard L. Madoff Investment Securities LLC…through accounts maintained by the Partnership at that firm….The services of BLM and its personnel are essential to the continued operation of the Partnership, and its profitability, if any." (Cl. ¶ 28.) Plaintiff decided to invest in the funds, knowing and relying on the strength of Citco's approval as administrator and PWC's approval as auditor because he had learned as an experienced investor that the administration and auditing of hedge funds was vital to their security. (Cl. ¶¶ 109-115.)

Plaintiff individually executed his first subscription and deposited $60 million in Greenwich Sentry's New York bank accounts on or about April 1, 2008. (*See* Subscription Documents, Citco Fund Services Ex. A.) He subsequently executed a new subscription on June 1, 2008 transferring the partnership assets into his trust. (Cl. ¶¶ 115-117.) Although he never withdrew funds from the account, he received monthly updates on his investment detailing his "gains." By October 31, 2008, plaintiff had received seven monthly NAV sheets from Citco demonstrating that his $60 million had risen in value to $62,540,565. (Cl. ¶ 120.) According to the NAVs, by the end of November 2008 he had totaled gains of 6.59% in just seven months, while the Dow Jones Industrial Average had lost 33.44% and the S&P 500 had lost 37.65%. (Cl. ¶ 121.) However by December 11, 2008, those numbers had been called into doubt: upon learning of the Madoff scheme, Stephenson requested withdrawal of the entirety of his account, but his requests were ignored. (Cl. ¶ 129.) His investment had been wiped out.[7] (Cl. ¶ 130.)

---

[7] In Madoff's own words:

> In fact, I never made those investments I promised clients, who believed they
> were invested with me in the split strike conversion strategy. To conceal my
> fraud, I misrepresented to clients, employees, and others that I purchased
> securities for clients in overseas markets …. I knowingly caused false trading
> confirmations and client account statements that reflected the bogus transactions

**2. Suspicious facts surrounding BMIS**

The Complaint describes a number of red flags surrounding BMIS "during the time that Citco and PWC provided services to Greenwich Sentry" that it alleges should have "placed them on notice of the Ponzi Scheme."  (Cl. ¶ 134.)

First, plaintiff alleges that operational risk was high because BMIS had complete control over all aspects of the trades: it held the securities, executed the trading strategy, and reported results.  "As a result there was no segregation of duties among independent reporters and thus a lack of internal control which resulted in a lack of investment transparency such that risk management was materially compromised."  (Cl. ¶¶ 135-136.)

Second, the complaint alleges that BMIS' transactions were at variance with market evidence.  In several cases, the positions that BMIS claimed to have placed using the split-strike conversion methodology were actually in excess of the actual open interest in the S&P 100 Put & Call market in those securities.  (Cl. ¶ 138.)  Furthermore, the complaint alleges that BMIS' over-the-counter option agreements would have been more expensive than similar trades made over the S&P 100 Put & Call market, and that this would have "materially reduced profits" because of the higher transaction costs.  The decision to engage in more expensive over-the-counter trades, then, was supicious.  (Cl. ¶¶ 137-141.)

Third, the Complaint generally alleges that a red flag was created by the fact that BMIS used manual trades despite Madoff's reputation "as an early and enthusiastic proponent of electronic trading," that Madoff refused to permit any "due diligence

---

and positions to be created and sent to clients purportedly involved in the split strike conversion strategy.
(Cl. ¶ 132 quoting *United States v. Madoff*, Hearing Tr. March 12, 2009 at 23-30.)

reviews" or "performance audits" of those manual trades, and that such a review would have revealed the Ponzi scheme.  (Cl. ¶¶ 142-146.)

Fourth, because BMIS' account statements were fake, the cash in Greenwich Sentry's accounts did not actually exist.  Accordingly, the Complaint alleges that cash and position reconciliations between Greenwich Sentry's books and the results reported by BMIS would have necessarily revealed material discrepancies.  (Cl. ¶¶ 147-149.)

Fifth, the Complaint alleges that the PPM permits BMIS to engage in securities lending of the securities in its portfolio.  Because BMIS did not actually own securities, however, it did not engage in securities lending.  A review of securities lending practices would have raised a red flag because it would have been irrational for BMIS to forego the investment income that securities lending would have provided.  (Cl. ¶¶ 150-151.) Similarly, because BMIS did not take out commercial bank loans in order to re-invest in itself (despite higher rates of return than prevailing interest rates), the Complaint alleges that its operations were irrational and suspicious.  (Cl. ¶ 161-163.)

Sixth, the reported results of BMIS were much higher and more stable than other firms using the same strategy.  (Cl. ¶¶ 152-156.)

Seventh and finally, the independent auditor for BMIS, Friehling and Horowitz, was small, not well known, and not properly certified.  (Cl. ¶¶ 157-160.)

Although the Complaint alleges that these red flags "were material," that they "would and/or should have placed" defendants on notice of the Ponzi scheme, and that they existed "during the time that Citco and PWC provided services to Greenwich Sentry

and the Limited Partners," (Cl. ¶ 134), and although it describes the flags in some detail, (Cl. ¶ 135-163), it does not allege actual knowledge of them by PWC and Citco.[8]

### 3. Citco and PWC did not discover the Ponzi scheme

The Citco entities allegedly had obligations to investigate these red flags, to confirm the accuracy of BMIS' representations, to accurately calculate NAVS, and to confirm the accuracy of account statements.  (Cl. ¶¶ 164-169.)  Nonetheless, they allegedly failed to do so.  (*Id.*)  Citco "failed to advise Plaintiff that the Madoff Firm was engaging in a Ponzi scheme, and that the Madoff Firm and/or Greenwich Sentry was or would become insolvent."  (Cl. ¶ 171.)  They failed to advise plaintiff that money from new investors was being used to pay the withdrawals of older investors, permitted Madoff to act jointly as custodian and broker, and did not investigate any of the purported red flags.  (Cl. ¶¶ 165, 173-180.)  In general, Citco is alleged to have failed in each aspect of its fund administration to discover the Madoff scheme, (Cl. ¶¶ 164-183, 198-201), or to discover that Greenwich Sentry and Fairfield Greenwich did not have the internal controls required to themselves discover such a scheme.  (Cl. ¶¶ 184-197.)

PWC had a number of obligations under GAAS and its own best practices in its audits.  It was required to satisfy itself, on the basis of competent evidence, that:

---

[8] The closest the complaint comes is ¶¶ 205(o) and 266(m), which both similarly reference the red flags as being "known" but do not allege knowledge:

> PWC failed, contrary to GAAS requirements, to satisfy itself that Greenwich Sentry had implemented adequate safeguards in the face of clear operational risk, and clear 'red flags' for auditors to consider that PWC knew and/or consciously avoided knowing were present in this case, including those heretofore alleged; (¶ 205(o))

Giving the Complaint its most favorable possible reading, this sub-paragraph includes an indirect assertion of knowledge on the part of PWC.  But to the extent it does, that allegation is both completely conclusory and far too general (alleging knowledge of 'heretofore alleged' red flags wholesale) to adequately allege knowledge of the individual red flags in the Complaint.

Greenwich Sentry's financial statements had been audited in accordance with GAAS, were fair presentations of partners' financial positions, and that internal controls had been adequately evaluated.  (Cl. ¶ 87.)  Further, PWC was obligated to qualify its opinion when an unqualified opinion could not be expressed, disclose sufficient information to allow a reader to appreciate the nature of the reported upon transactions, consider the likelihood of significant error in the information supplied to it, and consider the relationship between Greenwich Sentry, Citco, and BMIS.  (Cl. ¶ 87.)  Specifically, AU 332.20 states that, when dealing with service organizations such as BMIS was to Greenwich Sentry, "[t]he auditor may be unable to sufficiently limit audit risk without obtaining evidential matter about the operating effectiveness of one or more of the service organization's controls."  (Cl. ¶ 78.)  However according to the Complaint, PWC did not follow this rule:  PWC never met with the accountants for BMIS, never reviewed their work, nor ever had contact with BMIS outside of two non-audit meetings.  (Cl. ¶ 79.)

PWC understood that its auditing work would be relied upon by potential investors and limited partners.  (Cl. ¶ 92-94.)  It knew that its reports were material to an understanding of Greenwich Sentry's financial position, and that since partnership interests were not publicly traded there was no independent market evidence to which investors could refer.  (Cl. ¶ 93.)  For those reasons, plaintiff relied on PWC's unqualified audits in deciding to make his investment.  (Cl. ¶ 94.)  Nonetheless, PWC did not uncover the Madoff fraud and, as a result, did not qualify its audits.

**4.  Stephenson's claims**

Plaintiff has brought this action against Citco and PWC, claiming, in essence, that they failed to adequately carry out their duties to him and the Greenwich Sentry Fund, and that those failures (1) led to Greenwich Sentry's maintenance of its position in BMIS, and (2) induced plaintiff to invest in Greenwich Sentry.  Thus, these failures allegedly caused the loss of his investment.  Specifically, the Complaint alleges: (1) breach of Citco's fiduciary duties; (2) grossly negligent fund administration by Citco; (3) negligent auditing by PWC; (4) fraudulent misrepresentation by PWC; (5) breach of Citco's fund administration contracts, (6) breach of PWC's audit contracts, and (7) aiding and abetting, by all defendants, FGB and Greenwich Sentry's breach of fiduciary duty.


## II.  DISCUSSION

**1.  Standing**

Defendants assert that plaintiff lacks standing to pursue his claims directly because they are derivative of the partnership's claims and ought to be brought in the partnership's name.  Both parties and the Court agree that Delaware law, specifically the test set forth in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), controls on this issue.  (PWC Mem. 7; Pl. Opp. 13; Citco Mem. 14 (all treating Tooley as setting forth the relevant test.);  *See Debussy LLC v. Deutsche Bank AG*, No. 05 Civ. 5550, 2006 WL 800956, at *3 (S.D.N.Y. Mar. 29, 2006) ("When deciding issues of 'shareholder standing,' that is, whether claims should be brought directly or derivatively, courts must look to the law of the fund's state of incorporation.").  The *Tooley* test provides that in determining whether a claim is direct or derivative a court should inquire

into "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)."  *Tooley*, 845 A.2d at 1033.  "The stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing any injury to the corporation." *Id.* at 1039.  "[T]he determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases."  *Albert v. Alex. Brown Management Services, Inc.*, No. Civ.A. 762-Nm 2005 WL 2130607, at *12 (Del. Ch. Aug. 26, 2005).

At the outset the Court will address three of plaintiff's arguments that could apply broadly to all of the claims.

First, plaintiff prefaces his argument on the standing issue by pointing out that "[a]t the pleading stage, the allegations of the Complaint with respect to standing must be accepted as true and construed in favor of the plaintiff."  (Pl. Opp. 11.)  While it is true that the Court must accept *factual* allegations as true, the court cannot merely rely on "plaintiff's characterization of his claims in the complaint, but…must look to all the facts of the complaint and determine for itself whether a direct claim exists."  *San Diego County Employees Retirement Assoc. v. Maounis*, No. 07 Civ. 2618, 2010 WL 1010012, at *19 (S.D.N.Y. Mar. 15, 2010) (quoting *Dietrich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004); citing *In re Syncor Int'l Corp. Shareholders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004)  ("under Tooley, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint")).  Accordingly the Court

limits its favorable construction to the factual allegations of plaintiff's complaint, and does not take plaintiff's averments that its claims are direct at face value.

Second, plaintiff argues that "in the context of a Ponzi scheme, the damages to investors are treated as individual claims which they may purs[u]e against third parties, and are not derivative claims belonging to the corporation."  (Pl. Opp. 13.)  But plaintiff's claims are alleged to be derivative of Greenwich Sentry's, not BMIS', and there is no basis for extending this doctrine to non-ponzi entities that lost money in a Ponzi scheme. *Cf. Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) ("claims predicated upon the distribution of misleading PPMs to investors in [ponzi entity itself] are the property of those investors, and may be asserted only by them...").  To support this argument, plaintiff adds in its opposition papers the allegation, absent from the complaint, that Greenwich Sentry was itself a Ponzi scheme.  (Pl. Opp. 16 ("to the extent that Greenwich Sentry kept investors' money in its own accounts without transfer to BMIS, which it used to 'net out' to pay redemption requests based on the NAV statements of Citco and audited financials by PWC, it was a freestanding Ponzi scheme").)   But the complaint does not allege that Greenwich Sentry held money to an extent that could possibly support the contention that Greenwich Sentry was a freestanding Ponzi scheme,[9] nor does it actually allege that Greenwich Sentry was a freestanding Ponzi scheme.[10]

---

[9] The closest the Complaint comes is ¶ 125:

> [R]equests by Limited Partners in Greenwich Sentry for such redemptions or return, which could be made at the end of any month pursuant to the governing agreement, were made to Greenwich Sentry and/or Citco, *which then forwarded such requests to the Madoff Firm.  Madoff acted on those requests and forwarded the funds to Greenwich Sentry and/or Citco*, which in turn returned funds to the requesting Limited Partners.  These redemptions were an integral and essential

Third, plaintiff argues that Greenwich Sentry did not suffer any harm because "it was a passive vehicle" for investing with BMIS.  (Pl. Opp. 15.)  However plaintiff cites no authority to support its contention that a "passive" investment partnership is not a separate legal entity that suffers direct injury from (direct) investment in a Ponzi scheme. To the extent that plaintiff is seeking to distinguish a limited partnership from a corporation, "[t]he test for distinguishing direct from derivative claims in the context of a limited partnership is substantially the same as that used when the underlying entity is a corporation."  *E.g. Anglo Am. Security Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 150 (Del. Ch. 2003).

Turning to the application of *Tooley*, the parties confound the *Tooley* test in this case by conflating all of plaintiff's claims into one inquiry.  (*See* Citco Mem. 23; Pl. Opp. 11-19.)  But there is no reason that some claims arising out of a case or controversy could not be direct while other claims arising out of that case or controversy are properly derivative.  *Grimes v. Donald*, 673 A.2d 1207, 1212-13 (Del. 1996) ("the same set of facts may result in direct and derivative claims").  Since the *Tooley* test inquires into what duty was breached, what injury was suffered, and what relief is available, these factors must be determined with respect to each claim.  Some claims, such as those alleging individual inducement to invest and violations of duties owed to Stephenson individually

---

element of scheme [sic] in order to avoid collapse and disclosure of the Ponzi Scheme.  (emphasis added)
All that this alleges is that Greenwich Sentry forwarded requests to Madoff and then forwarded money back.  While in retrospect this *modus operandi* of Greenwich Sentry (and, probably, other feeder funds) helped to sustain Madoff's fraud, it does not, without more, implicate Greenwich Sentry in the Ponzi scheme.

[10] The closest the Complaint comes is the title of section E., "Greenwich Sentry is discovered to be part of a Ponzi scheme."  (Cl. between ¶ 122 and ¶ 123.)  However this section does not go on to allege anything other than what is known, that Greenwich Sentry was invested in a Ponzi scheme.

and separately from the partnership, may be direct.  Others, based on duties owed primarily to Greenwich Sentry and based on the injury the fund suffered when Madoff wiped out its investments, are likely derivative.  Accordingly the Court addresses whether each of plaintiff's claims is direct or derivative in turn.

### A.  Counts I, alleging breach of fiduciary duty and VII, alleging aiding and abetting breach of fiduciary duty, are derivative

Count I alleges breach of fiduciary duty against the Citco entities.  Count VII alleges that Citco and PWC aided and abetted the breach of fiduciary duty by Fairfield Greenwich.  Even if plaintiff's breach of fiduciary duty claims were not pre-empted by the Martin Act (which they are, as discussed below), the Court would dismiss them because they are derivative.

The first prong of the *Tooley* test is who suffered the harm.  Plaintiff's breach of fiduciary duty claims do not allege an injury to Stephenson independent of the injury to Greenwich Sentry.  The gravamen of plaintiff's breach of fiduciary duty claims is a failure to administer the fund such that the Madoff Ponzi scheme would be discovered. ("If Citco had not acted in manner [sic] alleged above, and had not failed to detect and/or advise Plaintiff of the Ponzi scheme…Plaintiff would not have suffered its loss." Cl. ¶ 227; "Citco was reckless in that it failed to review conflicting information that it had a duty to reconcile and monitor, and unreasonably and recklessly ignored the red flags." Cl. ¶ 228.)  A claim for deficient management or administration of a fund is "a paradigmatic derivative claim." *Albert v. Brown Mgmt. Serv., Inc.*, No. Civ.A. 762-N, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005) (citing, e.g. *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("A claim of mismanagement ... represents a

direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.").[11]  If, as alleged, defendants breached a fiduciary duty by not discovering that Greenwich Sentry's accounts were invested in what would become the most infamous Ponzi scheme in recent history, it necessarily injured Greenwich Sentry in so doing.  Therefore plaintiff cannot prevail on this claim without showing injury to the partnership Greenwich Sentry itself, and accordingly the claim is derivative.  *Tooley*, 845 A.2d at 1039 ("The stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing any injury to the corporation.").

### B.  Counts V and VI, alleging breach of contract, are derivative

Stephenson seeks to enforce the engagement contracts between Greenwich Sentry and defendants directly by asserting that as a limited partner he was a third party beneficiary of those contracts.  Even if that were true,[12] Stephenson could not

---

[11] This rule is not limited to internal managers.  *See Debussy*, 2006 WL 800956, at *3 (applying *Tooley* and finding breach of fiduciary duty claim against portfolio manager derivative because "the injury flowing from a claim of mismanagement-although admittedly here not by a corporate board of directors but rather by the portfolio manager of the Trust's assets-is a "wrong to the corporation").

[12] If the Court were to reach this question, it would hold that Stephenson was not an intended beneficiary of the agreements.  Nothing within the four corners of either the Citco or PWC agreements expresses an intent to benefit third parties.  Yet that is what is required.  *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir. 1991).  Although the services were performed for the benefit of the members of the partnership, that does not indicate that the parties intended to benefit individuals in their personal capacities but rather partners as the constituent members of the partnership.  The PWC engagement letter explicitly

demonstrate an injury (a breach of that contract) independent of injury to Greenwich Sentry (the promisee and primary beneficiary of the contract). Plaintiff does not allege an independent injury or breach of contractual obligations specific to him, but rather a general breach of the contracts that is applicable to the partnership at large, and as such he could not demonstrate his own injury without demonstrating that the partnership was injured. Accordingly, these claims are also derivative. *See Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905, 1996 WL 494904, at *9 (S.D.N.Y. Aug. 30, 1996) (finding third party contract derivative under pre-Tooley "special injury" test) (quoting *Orban v. Field*, Civ. A. No. 12820, 1993 WL 547187, at *9 (Del. Ch. Dec. 30, 1993) ("[t]he idea of shareholders having directly enforceable rights as third party beneficiaries to corporate contracts is, I think, one that should be resisted. One of the consequences of limited liability that shareholders enjoy is that the law treats corporations as legal persons not simply agents for shareholders")); *Cashman v. Coopers and Lybrand*, 623 N.E.2d 907, 910-11 (Ill. App. Ct. 1993) (same). If Stephenson wishes to enforce the engagement contracts he should make demand upon Greenwich Sentry to do so and, if that is unavailing, bring a derivative action in its stead.

---

disclaims an intent to benefit individual third parties. Under the heading "Reliance by Third Parties" it states: "[t]he financial statement audit will not be planned or conducted in contemplation of reliance by any specific third party…" (January 11, 2007 Engagement letter, Ex. C. to Duffy Aff.) And the Citco administrator contract contains an inurement and nonassignment clause that undermines any argument that the contracting parties intended to benefit third parties. "An inurement clause, when taken together with a prohibition of assignments, on the other hand, does suggest that the parties did not intend that third parties benefit from the contract. Language specifying that the benefit of a contract is to inure to the contract's signatories arguably is superfluous unless it serves to limit the category of beneficiaries." *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 164 (S.D.N.Y. 1998).

**C.  Counts II, III, and IV, alleging gross negligence, negligence, and fraud, are direct to the extent they allege inducement**

Plaintiff's claims based on theories of negligent and fraudulent inducement are direct to the extent (and only to the extent) that they allege (1) violation of a duty owed to potential investors at large and (2) that such violations induced plaintiff to invest in Greenwich Sentry.  While the Court has its doubts that plaintiff's negligence and gross negligence claims adequately so plead,[13] plaintiff's fraud claim clearly alleges such a theory.  Such claims are direct because they allege a harm suffered by plaintiff independent of the partnership and a duty to plaintiff that is not merely derivative of PWC's fiduciary duties to the partnership.  *See e.g. Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488 (S.D.N.Y. 2003) (discussing duties that accountants owe to the general public).  "[T]he main dividing line between direct and derivative claims styled as 'fraudulent inducement,' [is] whether the plaintiff has alleged some injury other than that to the corporation."  *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1177 (Del. Ch. 2006).  As plaintiff alleges, he knew of PWC's unqualified audits prior to investing in Greenwich Sentry, and "would not have made its initial investment in Greenwich Sentry" if not for PWC's opinion.  (Cl. ¶ 268.)  And recovery on a claim based solely on inducement would only flow to those individuals, such as plaintiff alleges he was, who were so induced.  For example, damages from an inducement claim based solely on a fraudulent November 5th, 1955 report would only be available to that subset of limited partners who invested after that date.  Accordingly, plaintiff has standing to bring his inducement claims directly.

---

[13] The Court does not reach the question of whether plaintiff has adequately plead negligence or gross negligence because it finds such claims to be preempted by the Martin Act.  *See infra pt. 2(a)*.

## 2.  Martin Act preemption

### A.  Causes of action covered

Defendants assert that some, but not all, of plaintiff's claims are preempted by the Martin Act, New York's blue sky statute.[14]  *See* N.Y. Gen. Bus. L. § 352-c (2003).[15] Specifically, defendants assert preemption of Count I (breach of fiduciary duty), Count II (gross negligence), Count III (negligence and professional malpractice), and Count VII (aiding and abetting breach of fiduciary duty).  They do not assert preemption of Count IV (fraud) or Counts V and VI (breach of contract).

The Martin Act authorizes the New York Attorney General to enforce its provisions with implementing regulations and actions for restitution and damages for injured parties.  *See* N.Y. Gen. Bus. L. § 353.  The purpose of the Act is

---

[14]  The Martin Act was first passed in 1921.  It was sponsored in the New York State Legislature by its namesake, Francis J. Martin, a state legislator who later became a state court judge.  Jerry W. Markham, *A financial history of modern U.S. corporate scandals: from Enron to Reform* 148 (2006).

[15]  This section states:

    It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices:

        (a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
        (b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
        (c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made; where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, as defined in section three hundred fifty two of this article, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.

>to create a statutory mechanism in which the Attorney General would have
>broad regulatory and remedial powers to prevent fraudulent securities
>practices by investigating and intervening at the first indication of possible
>securities fraud on the public and, thereafter, if appropriate, to commence
>civil or criminal prosecution

*CPC Intl. v. McKesson Corp.*, 70 N.Y.2d 268, 277 (1987).  In furtherance of this desired

consistency, the New York Court of Appeals in *McKesson* held that there is no private

right of action under the Act, as "consistency of purpose with the statute includes

consistency with this enforcement mechanism." *Id.*  Although the *McKesson* court did

not address the impact of this holding on existing common law claims featuring the same

or similar elements, shortly thereafter "three of the appellate divisions interpreting the

decision held that the Martin Act preempts any common law claims within its purview."

*Nanopierce Techs., Inc. v. Southridge Capital Management LLC*, No. 02 Civ. 0767, 2003

WL 22052894, at *2 (S.D.N.Y. Sept. 2, 2003).  As Judge Sand explained in his

comprehensive overview of Martin Act preemption in *Nanopierce*, "later New York state

decisions adopted the same rule," *id.*, as did "just about every federal court to consider

the question." *Id.*; *see also Pro Bono Invs., Inc. v. Gerry*, No. 03 Civ. 4347, 2005 WL

2429787, at *16 (S.D.N.Y. Sep. 30, 2005) (Koeltl, J.) ("Most New York courts have

further held that the [Martin] Act precludes a private right of action for common law

claims the subject matter of which is covered by the Martin Act….The federal courts

have, almost without exception, adopted the same position.") (*citing Rego Park Gardens*

*Owners Ass'n v. Rego Park Gardens Assocs.*, 595 N.Y.S.2d 492, 494 (2d Dep't 1993);

*Eagle Tenants Corp. v. Fishbein*, 582 N.Y.S.2d 218, 219 (2d Dep't 1992); *Horn v. 449 E.*

*57th Co.*, 547 N.Y.S.2d 1, 5 (2d Dep't 1989); *Marcus v. Frome*, 329 F. Supp. 2d 464,

475-76 (S.D.N.Y. 2004)).

In the only case by the Second Circuit to discuss the issue, it also adopted this approach and dismissed a breach of fiduciary claim because of Martin Act preemption:

> The New York Court of Appeals has held that there is no implied private right of action under the Martin Act, and other New York courts have determined that sustaining a cause of action for breach of fiduciary duty in the context of securities fraud would effectively permit a private action under the Martin Act, which would be inconsistent with the Attorney General's exclusive enforcement powers thereunder.

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, (2d Cir. 2001).

Martin Act preemption does not extend to those common law claims that require additional elements beyond what is required for Martin Act liability, such as common law fraud claims that require a showing of intent.  As Judge Sand explained, New York courts have offered a persuasive justification for allowing common law fraud claims to proceed while dismissing negligent misrepresentation and breach of fiduciary duty claims: "the latter two causes of action, like the Martin Act itself, do not require proof of deceitful intent; common law fraud, however, does…courts concerned with preserving the Attorney General's exclusive domain therefore preclude claims which essentially mimic the Martin Act, but permit common law fraud claims, which require an additional element."  *Nanopierce*, 2003 WL 22052894 at * 4 (*citing Horn v. 440 E. 57th Co.*, 151 A.D.2d 112, 547 N.Y.S.2d 1, 5 (1st Dep't 1989) ("Fairly construed, [causes of action for negligent misrepresentation and breach of fiduciary duty] omit the element of a deceitful intent on defendant's part and substitute therefore the existence of a fiduciary relationship of trust and confidence."); *Whitehall Tenants Corp. v. Estate of Olnick*, 213 A.D.2d 200, 623 N.Y.S.2d 585, 585 (1st Dep't 1995) ("Without evidence of reliance … or intent to defraud … plaintiff is endeavoring to vindicate [rights committed] exclusively to the Attorney General."); *Granite Partners L.P. v. Bear Stearns & Co.*, 17 F. Supp. 2d 275,

291 n. 8 (S.D.N.Y. 1998) ("The Martin Act does not preclude private litigants from bringing common law fraud claims because such claims require a plaintiff to prove intent or scienter.  Therefore, courts allow these claims to proceed while simultaneously dismissing negligent misrepresentation and breach of fiduciary duty claims.")).  *See also Pro Bono Invs.*, 2005 WL 2429787 at *16 n. 16 ("Unlike Counterclaims Eight through Thirteen and Fifteen [alleging *inter alia*, breach of fiduciary duty, negligence, and gross negligence], the common law fraud alleged in the Seventh Counterclaim is not 'covered' by the Martin Act because it requires an additional element of deceitful intent."); *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 421 ("The vast majority of state and federal courts have found that causes of action related to a plaintiff's securities fraud claim that do not include scienter as an essential element are typically preempted by the Martin Act, in contrast to a claim requiring intent, such as a claim for common law fraud." (quoting *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120, 2005 WL 1902780, at *22 (S.D.N.Y. Aug. 9, 2005))).

As may be observed, a multitude of courts have dismissed claims materially similar to the breach (and abetting breach) of fiduciary duty, negligence, and gross negligence claims that defendants assert are preempted here.  One closely analogous case is *In re Bayou Hedge Fund Litig.*, *id.*, in which the plaintiff brought a breach of fiduciary duty claim against its investment advisor for allegedly conducting inadequate diligence before recommending investment in a hedge fund that was ultimately revealed to be a Ponzi scheme.  The court "concur[red] with the analysis set forth in *Castellano, Nanopierce*, and a host of other state and federal decisions finding breach of fiduciary duty claims arising in the securities context to be preempted by the Martin Act," and

concluded that the plaintiff's "cause of action for breach of fiduciary duty [was] precluded by the Martin Act." *Id*. at 422.

Although fraud claims had not traditionally been considered preempted under the Martin Act, the New York Court of Appeals recently found that even they can be preempted, if the allegations are based on a filing required by the Attorney General's Martin Act implementing regulations.  In *Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. Partnership*, 12 N.Y.3d 236, 906 N.E.2d 1049 (N.Y. 2009), the New York Court of Appeals was presented with a purported fraud stemming from "supposedly false and fraudulent representations and material omissions in [the defendant condo sponsor's] sales brochures and advertisements."  The court noted that the alleged omissions were in disclosure documents that the Attorney General had required through a Martin Act implementing regulation.  *Id.* at 243-244 (the Attorney General has the power to regulate newly constructed condominiums pursuant to N.Y. Gen. Bus. Law § 352-e(6)). Therefore the Court of Appeals determined that a fraud cause of action based on those omissions would effectively be a private cause of action for a Martin Act violation, violating the requirement that there is no private right of action under the statute.  *Id*. at 244-247 (citing *McKesson*, 70 N.Y.2d 268, 276-277 (1987)).  Although the Court of Appeals found the fraud cause of action preempted in light of § 352-e(6), it did not address traditional Martin Act preemption under § 352-c, such as whether fraud causes of action implicating that section should also be preempted.

In a somewhat inverted reading of the case, plaintiff asserts that *Kerusa* narrowed the scope of Martin Act preemption and thus forecloses preemption of his claims.  As plaintiff reads *Kerusa*, it created a new test limiting Martin Act preemption to claims

based solely on nondisclosures or violations of statutory requirements created by the

Martin Act itself.  But as explained above, *Kerusa* only resolved whether a common law

fraud claim, traditionally treated as non-preempted, could be preempted in the specific

context presented.  Nothing in the opinion suggests that the Court of Appeals, in

expanding Martin Act preemption into the fraud realm, intended to diminish it with

respect to other types of claims.  A significant body of precedent has developed regarding

preemption of, *inter alia*, negligence and breach of fiduciary duty claims, and this Court

is unwilling to conclude that the New York Court of Appeals tacitly overturned it.

The reasoning of *Kerusa* supports the traditional application of preemption to

claims that are covered by § 352-c of the Martin Act.  As *Kerusa* explained, the Martin

Act allows the Attorney General to promulgate disclosure requirements for newly

constructed condominiums.  N.Y. Gen. Bus. Law § 352-e(6).  Permitting a fraud claim

based on information contained in those disclosures would "expand the already detailed

disclosure requirements of the Martin Act by forcing parties to disclose [a wide array of

problems]… in order to avoid transforming every potential latent construction defect case

into a claim for common-law fraud on account of alleged omissions in Martin Act

disclosures."  The decision to preempt fraud claims in this instance is one narrow

application of the policy expressed in *McKesson*, that private causes of action which

impinge on the Attorney General's authority under the Martin Act are preempted in order

to maintain the exclusivity of that authority.  Just as the application of that policy to §

352-e(6) in *Kerusa* led to preemption of certain fraud claims (because they would

impinge on the Attorney General's authority with respect to disclosure regulations), its

application to § 352-c requires preemption of those common law claims that would

impinge on his authority under *that* section to prosecute certain securities violations.

      Plaintiff cites a number of cases in support of his contrary position, none of which

reject the traditional understanding of Martin Act preemption or adopt plaintiff's view

that preemption is limited solely to those cases rooted in a violation of the Attorney

General's disclosure regulations (as opposed to the other securities violations within the

Act's purview).  *See Kramer v. W10Z/515 Real Estate Ltd. Partnership*, 44 A.D.3d 457,

844 N.Y.S.2d 18, 9-21 (1st Dep't 2007) (dealing, as *Kerusa* did, with fraud claim based

on information in required disclosure documents); *Hamlet on Old Oyster Bay Home*

*Owners Assn., Inc. v. Holiday Org., Inc.,* 59 A.D.3d 673, 874 N.Y.S.2d 508 (2nd Dept.

2009) (recognizing that duties imposed under Martin Act "are exclusively enforceable by

the Attorney General" and thus limiting negligence claim against condominium to duties

unrelated to Martin act); *Bridge St. Homeowners Assn. v. Brick Condominium*

*Developers, LLC*, 18 Misc. 3d 1128(A), 856 N.Y.S.2d 496 (Sup. Ct. Kings Co. 2008)

(basing decision on unique interplay between Martin Act requirements and homeowner's

rights against a negligent carpenter or condo builder); *Country Pointe at Dix Hills Home*

*Owners Assn. v. Beechwood Org.*, 21 Misc. 3d 1110(A), 873 N.Y.S.2d 510 (Sup. Ct.

Suff. Co. 2008) (in condominium case, addressing Martin Act preemption of fraud and

breach of contract claims only);  *Caboara v. Babylon Cove Devel., LLC*, 54 A.D.3d 79,

862 N.Y.S.2d 535 (2nd Dep't 2008) (same).

      Accordingly the Court finds that the overwhelming weight of authority supports

Martin Act preemption of negligence and breach of fiduciary duty claims arising in the

securities context.  This is not the only court dealing with state law claims related to the

Madoff fraud to recently so find. *Barron v. Igolnikov*, No. 09 Civ. 4471, 2010 WL

882890 (S.D.N.Y. Mar. 10, 2010) also involved fallout from the Madoff Ponzi collapse.

In that action before Judge Griesa, plaintiff Andrea Barron brought a putative class action

on behalf of all investors who acquired and/or held limited partnership interests in certain

funds. Those funds had invested indirectly with Madoff by allocating a portion of their

assets to four feeder funds. *Id.* at *2. The plaintiff claimed, much like Stephenson does,

that there were "red flags" associated with Madoff that the fund's research division

discovered or should have discovered. Failure to warn of these red flags or to

appropriately qualify account statements allegedly constituted (1) breach of fiduciary

duty, (2) aiding and abetting breach of fiduciary duty, (3) gross negligence, and (4) unjust

enrichment. Noting that the importance of Martin Act preemption was underscored by

the fact that the New York Attorney General has pending claims against one of the feeder

funds used, the court found that plaintiff's claims were preempted by the Martin Act. *Id.*

at *6.


### B. Geographic coverage

Plaintiff's claims for breach of fiduciary duty, aiding and abetting that breach,

negligence, and gross negligence are therefore preempted if they fall within the Martin

Act's geographic purview, that is if they are based on activities engaged in to promote or

induce the sale of securities "within or from" New York.[16] N.Y. Gen. Bus. Law § 352-

c(1); *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading

Co.*, 179 F. Supp. 2d 159, 162 (S.D.N.Y. 2001) ("that the transactions were … within or

---

[16] Neither party disputes that limited partnership interests are considered securities for
purposes of the Martin Act. *See* N.Y. Gen. Bus. Law § 352(1); *Mayer v. Oil Field Sys.
Corp.*, 721 F.2d 59, 65 (2d Cir. 1993).

from New York [is] a nexus expressly required under the Martin Act.")  Plaintiff asserts that they do not because, *inter alia*, defendants are not based in New York and the limited partnership agreement contains a Delaware choice of law provision.  Defendants have the better of the argument.

Each of the challenged claims alleges inducement to purchase or to maintain an interest in securities, so the question under the Martin Act, then, is whether those securities were sold "within or from" New York.[17]  Several Courts in this District have found that "a transaction is 'within or from' New York for purposes of the Martin Act if a plaintiff alleges that a 'substantial portion' of the events giving rise to a claim occurred in New York."  *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 611 n. 9 (S.D.N.Y. 2008); *Abu Dhabi Commercial Bank*, No. 08 Civ. 7508, 2009 WL 2828018, at *14 (S.D.N.Y. Sept. 2, 2009) (quoting *Heller*).  Thus, the *Igolnikov* court found that the limited partnership interest purchases in that case were "within or from" New York because "plaintiff is a New York resident, Madoff's fraud was centered in New York, and the Selectinvest ARV LP fund in which plaintiff invested is a domestic fund managed by UBPAM from its New York headquarters."  *Igolnikov*, 2010 WL 882890, at *6.  And in *Sedona Corporation v. Ladenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120, 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005), despite the fact that the alleged misrepresentations had been made to the plaintiff outside of New York, there was a sufficient nexus with New York to implicate the Martin Act because of the complaint's allegations that the

---

[17] The Martin Act asks whether securities were *sold* within or from New York.  It does not ask whether the activities giving rise to a complaint were within New York.  The Martin Act covers misrepresentations "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from [New York] of any securities or commodities…"  N.Y. Gen. Bus. L. § 353.  Of course to some extent the locus of the facts giving rise to a claim will inform the location of a sale of securities, but the statutory text plainly provides that the dispositive geographic factor is where the securities are being sold from.

defendant was situated in New York, conducted communications from New York, and that the securities at issue were manipulated and sold short in New York markets.  *Id*. at *22 (dismissing negligence, negligent misrepresentation, and breach of fiduciary duty claims).

Stephenson's complaint explains the substantial connection the sale of these securities had to New York in its introductory, venue, and jurisdiction sections. Greenwich Sentry, the fund through which plaintiff invested in Madoff and lost his investment, is centered in New York, it has its office "[w]ithin the State and County of New York" and it "was actively doing business within the State and County of New York."  (Cl. ¶ 21.)  "Greenwich Sentry's principal place of business is in the State and County of New York[, it] transacted business in and from the State and County of New York in connection with the matters at issue," (Cl. ¶ 5), and it "maintained its bank accounts in connection with the Fund at issue in the State of New York."  (*Id.*) Subscribers in Greenwich Sentry deposited their investments in Greenwich Sentry's bank accounts, located in New York.  (*See* Subscription Documents, Citco Fund Services Ex. A.).  Thus limited partnership shares in Greenwich Sentry were sold in and from New York.

The connections with New York go well beyond the fact that shares of Greenwich Sentry were sold from within the state.  The NAVs on which plaintiff allegedly relied were sent "to Greenwich Sentry in New York," and "Citco Europe [and Citco Canada] needed to have, and did in fact have, regular and systematic contact with Greenwich Sentry and the Greenwich Sentry General Partners (all of whom were located in New York) in order to perform the services which it contracted to and did perform.  (*Id.*; Cl. ¶

22.)  The complaint is explicit that "[t]he claims against Citco Europe spring directly from and are directly related to its contacts within the State and County of New York." (Cl. ¶ 21 (as do the claims against Citco Canada, Cl. ¶ 22, and as do those against PWC, Cl. ¶ 23).)  Finally, not only was Greenwich Sentry in New York, but the fund in which it was principally invested, BMIS, was also located principally in New York.

Plaintiff cites as contrary authority *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 592 F. Supp. 2d 608, 639-640 (S.D.N.Y. 2009), wherein these same defendants failed to satisfy the geographic prong of the Martin Act.  However those claims did not have a sufficient nexus with New York because the securities at issue "[w]ere mostly marketed and sold to foreign investors, and only a limited number of investors in the United States participated."  *Id.*  (not discussing where securities were sold from).  This case is much different.  The relevant securities here are shares of the Greenwich Sentry fund that were sold "within or from" New York, it had primarily domestic investors, and according to the complaint *all* of the General Partners were located in New York.  (Cl. ¶ 22.)  Furthermore in making its Martin Act determination *Pension Committee* did not explicitly address the locus from which the securities therein were sold.  This Court finds in light of the plain language of the statute that the relevant inquiry is where securities are sold *from*, and so the fact that they were sold to a plaintiff in Texas,[18] or that audit work occurred in Canada, is hardly outcome determinative.  *See supra*, p. 29, n. 16.

Because plaintiff's claims for breach of fiduciary, negligence, gross negligence, and aiding and abetting breach of fiduciary duty involve the sale of securities within or

---

[18] A focus solely on the location of the purchaser would defy the statute's "from or within" language.  A sale  "from" New York goes "to" someplace else: a New York to New York sale would be "within" the state.

from New York, they are preempted by the Martin Act.  Accordingly counts I, II, III, and VII of the amended complaint are dismissed.

### 3.  Plaintiff's fraud claim is inadequately plead

Defendant PWC argues that plaintiff's fraud claim has not been plead adequately under Federal Rule 8(a)(2) or with the particularity required for fraud pleadings under Federal Rule 9(b).  The Court will first address the legal standards under both of these rules before addressing the adequacy of the complaint's fraud allegations.

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (abrogated in part by *Twombly*)).  In *Twombly*, the Supreme Court held that to satisfy this standard, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570; *See Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*).  In *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868 (May 18, 2009), the Court clarified three aspects of the analysis mandated by *Twombly*.  First, the Court reiterated that courts may not presume illegality when the "nub" of a complaint, *id.* at 1950, alleges conduct that is equally capable of being legal:  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 557).  Second, the Court held that only well-pled factual allegations are entitled to

a presumption of truth; "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949. *Cf. id.* at 1960 (Souter, J., dissenting) (arguing that conclusory statements should not be disregarded if rendered plausible by the context in which they appear). Third, the Court held that *Twombly*'s "plausibility standard" was not limited to antitrust cases or those requiring complex discovery. While "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task," *Iqbal*, 129 S.Ct. at 1950, *Twombly* interpreted Rule 8 and therefore applies to "all civil actions." *Id.* at 1953 (quoting Fed. R. Civ. P. 1). Under this understanding of Rule 8, a complaint alleging that the former Attorney General and the former Director of the Federal Bureau of Investigation engaged in purposeful discrimination did not state a claim, even though the complaint alleged that they had "willfully and maliciously agreed to subject" the plaintiff to harsh conditions of a confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." *Iqbal*, 129 S.Ct. at 1944.

Read together, *Twombly* and *Iqbal* suggest that the Court keep in mind two requirements when adjudicating a motion to dismiss that challenges the sufficiency of a complaint's factual allegations. First, although the Court must still accept factual allegations as true, it should not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal*, 129 S.Ct. at 1949. Second, accepting creditable allegations as true, the Court must also determine whether they plausibly suggest an entitlement to relief. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (adopting this reading of Iqbal). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.  If the factual

averments permit no reasonable inference stronger than the "mere possibility of

misconduct," the complaint should be dismissed.  *Starr*, 592 F.3d at 321 (quoting *Iqbal*,

129 S.Ct. at 1950).

Under New York law, a fraud claims requires "a material misstatement, known by

the perpetrator to be false, made with an intent to deceive, upon which the plaintiff

reasonably relies and as a result of which he sustains damages." *E.g. Ambassador

Factors v. Kandel & Co.*, 215 A.D.2d 305, 307, 626 N.Y.S.2d 803 (1st Dep't 1995).  The

requisite state of mind, then, is a deliberate intent to deceive.  However under New York

law (as in the federal securities law context) this intent can be demonstrated by

recklessness of sufficient degree to create an inference of intent.  *See State Street Trust

Co. v. Ernst*, 278 N.Y. 104, 111, 15 N.E.2d 416, 120 A.L.R. 1250 (1938) ("heedlessness

and reckless disregard of consequence may take the place of deliberate intention" in

proving fraud claim against auditor); *compare Decker v. Massey-Ferguson, Ltd.*, 681

F.2d 111, 120 (2d Cir. 1982) (recklessness satisfies federal securities law's intent

requirement when conduct is "highly unreasonable" representing "an extreme departure

from the standards of ordinary care").

The Court tests the complaint's scienter allegations against Federal Rule of Civil

Procedure 9(b), which requires that fraud be plead with particularity.  Fed. R. Civ. P.

9(b).  Although under this rule "scienter need not be alleged with great specificity,

plaintiffs are still required to plead the factual basis which gives rise to a 'strong

inference' of fraudulent intent." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d

Cir. 1990) (applying Rule 9(b) pre-PSLRA).[19]  This Circuit has long held in the securities

fraud context that such intent may be established only by "(a) alleging facts to show that

defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness."

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006).  In order to survive a

motion to dismiss, then, plaintiff must have either alleged motive and opportunity or facts

---

[19] The case-law in this area presents a situation that strains the Erie doctrine.  Since the passage of
the Private Securities Litigation Reform Act (PSLRA), the case-law has developed applying both
Federal Rule 9(b) and the PSLRA to allegations of fraudulent intent.  Federal Rule 9(b) is
undisputedly procedural, but the PSLRA's scienter rule, set forth in 15 U.S.C.A. § 78u-4(b)(2),
although procedural is explicitly limited by its terms to actions arising under chapter 15 of the
U.S. Code.  (although the PSLRA's "strong inference" language had been used by this Circuit in
the 9(b) context prior to its passage, *see e.g. Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124,
1128 (2d Cir. 1994)).  As the cases have developed since the passage of the PSLRA, Federal Rule
9(b) has become entangled with § 87u-4(b)(2), and the result is a composite doctrine combining a
generally applicable procedural rule with one that is statutorily limited to federal claims in its
application.  The New York State cases cited by plaintiff are not helpful because they were not
decided in the context of the federal pleading standards, particularly Rule 9(b), and the Court is to
apply federal procedural rules to state law claims when it is sitting in diversity.  *See generally
Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (Federal Rules of Civil
Procedure are procedural rules to which federal courts sitting in diversity must adhere).  So
should a federal court sitting in diversity apply the composite doctrine to state law fraud claims?

Precedent seems to indicate that it should: the other courts in this circuit to have tested
state law fraud claims against Rule 9(b) have, either explicitly or tacitly, taken that approach.  *See
Bay Harbour Management LLC v. Carothers*, 282 Fed. Appx. 71 (2d Cir. 2008) (after analyzing
plaintiff's federal securities claims under the composite standard (and citing *Lerner* for the test
quoted, *infra*, in the text), holding that "[f]or the same reasons set forth above, [plaintiffs] have
failed to plead facts, with the particularity required by Federal Rule of Civil Procedure 9(b), that
could give rise to a claim for common law fraud"); *Canada, Inc. v. Aspen Technology, Inc.*, 633
F. Supp. 2d 15, 29-30 (S.D.N.Y. 2009) (finding federal case-law not controlling because "the
instant case does not concern fraud under the PSLRA but rather common law" but nonetheless
finding it "persuasive," and applying it to common law fraud claim) (citing *Glidepath Holding
B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 451 (S.D.N.Y. 2007) (federal law interpreting
PSLRA persuasive authority in assessing adequacy of pleading of common law fraud claim.));
*Hammerstone NV, Inc. v. Hoffman*, No. 09 CV 2685, 2010 WL 882887, at *10 (S.D.N.Y. Mar.
10, 2010) ("Although a common law fraud claim need not meet the particularity requirements of
the PSLRA, it still must meet the nearly identical requirements of Rule 9(b).").

The parties have not argued that the Court should abandon the composite case-law, and
indeed both plaintiff and PWC cite to cases invoking the PSLRA as if those cases are controlling.
(*See* Pl. Opp. 44; PWC Mem. 9-10.)  Accordingly the Court applies the Rule 9(b) case-law
without regard (beyond this footnote) to the fact that it concomitantly invokes the PSLRA.

constituting strong circumstantial evidence of conscious misbehavior or recklessness.  He has not.

### A. Motive and opportunity

Plaintiff has not alleged that PWC had any cognizable motive for fraud, so he cannot satisfy the scienter requirement by alleging motive and opportunity.  The only conceivable motive alleged by plaintiff is PWC's economic interest in maintaining Fairfield Greenwich as a client.  (*See* Cl. ¶ 214.)  However "[t]he mere receipt of compensation and the maintenance of a profitable professional business relationship for auditing services does not constitute a sufficient motive for purposes of pleading scienter. *Zucker  v. Sasaki*, 963 F. Supp. 301, 308 (S.D.N.Y. 1997) (citing *Duncan v. Pencer*, No. 94 Civ. 0321, 1996 WL 19043, at *9-10 (S.D.N.Y. Jan. 18, 1996); *Friedman v. Arizona World Nurseries Ltd. Partnership*, 730 F. Supp. 521, 532 (S.D.N.Y. 1990), *aff'd*, 927 F.2d 594 (2d Cir. 1991).  "To hold otherwise would effectively abolish the requirement of pleading facts which support a strong inference of scienter against professional defendants."  *Id.*, citing *Duncan*.  And it is economically irrational to risk your professional reputation, license, and the possibility of legal liability simply in return for a professional services fee.  *Id.* citing *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1129-1130 (2d Cir. 1994) (dismissing fraud claim and also noting that plaintiff's pleading technique, "to couple a factual statement with a conclusory allegation of fraudulent intent," is inadequate).  Accordingly it is not plausible to suggest that PWC was motivated to risk its very business in furtherance of maintaining Fairfield Greenwich as a client.

**B.  Circumstantial evidence that PWC acted recklessly**

The only remaining basis for finding that intent is alleged in the complaint, then, is evidence of recklessness sufficient to create an inference of fraud.[20]  This standard is "demanding," and "for an accountant to be found to have acted recklessly during an audit, its alleged misconduct must approximate an actual intent to aid in the fraud being perpetrated by the audited company."  *In re Scottish Re Group Securities Litigation*, 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007); *see e.g. In re IMAX Securities Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008); *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000).  The complaint alleges three kinds of misconduct by PWC that led to misstatements in its audits: (1) failure in general to follow GAAP, (2) failure to discover that Greenwich Sentry lacked adequate internal controls to discover the Madoff fraud itself, and (3) failure to investigate BMIS despite the existence of red flags that, if discovered, should have raised suspicions about its operations.

*(i)  GAAP*

Although they are not irrelevant to the issue of recklessness, "allegations of GAAP and GAAS violations are not sufficient, on their own, to establish scienter."  *In re AOL Time Warner, Inc. Securities and "ERISA" Litig.*, 381 F. Supp. 2d at 240. "[F]ailure [by PWC] to comply with Generally Accepted Accounting Practices or other such irregularities are insufficient to establish recklessness.  To rise to the state of mind required, these allegations must be coupled with evidence of corresponding fraudulent intent."  *West Virginia Investment Management Board v. Doral Financial Corp.*, 344 Fed. Appx. 717, 179-720 (2d Cir. 2009) (discussing defendants' argument that plaintiff

---

[20] Plaintiff has not alleged or argued a "conscious misbehavior" theory separate from his theory that the allegations support an inference of recklessness.

"failed to plead facts giving rise to the strong inference of scienter required by Fed. R. Civ. P. 9(b) and the [PSLRA]"); *see, e.g. In re Scottish Re Group Securities Litigation*, 524 F. Supp. 2d at 385 (scienter standard "requires more than a failure to follow GAAP"); *Whalen v. Hibernia Foods PLC*, No. 04 Civ. 3182, 2005 WL 1799370, at *3 (S.D.N.Y. Aug. 01, 2005) ("Allegations of GAAP and GAAS violations alone are insufficient" to demonstrate strong circumstantial evidence of conscious misbehavior or recklessness).

### *(ii)  Failure to investigate internal controls at Greenwich Sentry*

The allegations that PWC failed to adequately investigate Greenwich Sentry's internal safeguards, independent of the fraud at BMIS, do not satisfy the scienter element of plaintiff's fraud claim.  "In the accounting context, failure 'to identify problems with the defendant company's internal controls and accounting practices does not constitute recklessness'"  *West Virginia Investment Management Board v. Doral Financial Corp.*, 344 Fed. Appx. 717, 720 (quoting *Novak v. Kosaks*, 216 F.3d 300, 309 (2d Cir. 2000)) (both noting that neither such allegations nor GAAS violations are sufficient to establish recklessness, "[t]o rise to the state of mind required, these allegations must be coupled with evidence of 'corresponding fraudulent intent'")

### *(iii) Red flags*

Although allegations of GAAP violations and investigatory failures do not alone establish recklessness, they can when combined with allegations that the auditor ignored red flags.  Plaintiff argues that because the Complaint sets forth that PWC failed "to heed 'red flags' about [BMIS] which internal controls would, if enforced, detect," an inference of recklessness is warranted.  (Pl. Opp. 43.)  Indeed, allegations that an auditor ignored

"red flags" that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing, "when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter."  *In re AOL Time Warner, Inc. Sec. And "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004);  *see In re Allou Distributors, Inc.*, 395 B.R. 246 (Bkrtcy.E.D.N.Y. 2008) (reviewing New York common law fraud claim and noting that "at the pleading stage … allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss").  However the auditor must have actually been aware of the red flags, either because they are alleged to have had actual knowledge or because the red flags were so obvious that the auditor must have been aware of them: "merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient."  *In re IMAX Securities Litig.*, 587 F. Supp. 2d 471, 484 (S.D.N.Y. 2008).  "While a red flag need not reveal to a defendant all aspects of a given fraud, plaintiffs must allege that facts which come to a defendant's attention would place a reasonable party in defendant's position on notice of wrongdoing."  *In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007).

Thus, complaints alleging that an auditor had actual knowledge of and consciously disregarded red flags have been found to sufficiently plead scienter.  *See SEC v. Gold*, No. 05 Civ. 4713, 2006 WL 3462103, at *4-5 (E.D.N.Y. Aug. 18, 2006) (noting that scienter can be inferred where "auditor consciously disregards red flags," and finding allegation in complaint that auditor "*knew* that … selling prices were below their inventory cost sufficient to allege recklessness" (emphasis in original)); *Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 Civ. 3374, 1999 WL 101772, at *2, *14-15

(S.D.N.Y. Mar. 01, 1999) (fraud claim against auditor survived motion to dismiss where complaint alleged that defendant auditor's workpapers indicated that it had examined and consciously disregarded suspicious documents); *AOL Time Warner, Inc. Securities And "ERISA" Litigation*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004) (inference of scienter supported in presence of red flags combined with "specific allegations beyond E & Y's status as an auditor," distinguishing complaint from those where allegations of recklessness "based solely on [] status as an auditor"); *Whalen v. Hibernia Foods PLC*, 2005 WL 1799370, at *3-4 (S.D.N.Y. 2005) (recklessness where complaint alleged GAAP and GAAS violations as well as that auditor "knew about and ignored a wide variety of red flag[s]").

In a handful of other cases, red flags have been considered so obvious that knowledge of them by the auditor could be presumed.  *See In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (GAAP violations plus "additional facts showing that there were numerous red flags that [auditor defendant] must have been aware of, if it were conducting any kind of audit" are sufficient to create strong inference of reckless behavior); *In re Philip Services Corp. Securities Litig.*, 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004) ("because the red flags would be clearly evident to any auditor performing its duties, one could reasonably conclude that [auditor] must have noticed the red flags, but deliberately chose to disregard them") (quoting *In re Leslie Fay Companies Sec. Litig.*, 871 F. Supp. 686, 699 (S.D.N.Y. 1995)).

On the other hand, without a plausible allegation that defendant auditors knew of red flags, general allegations of red flags have been found insufficient to demonstrate scienter.  *See In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d at 663 ("plaintiffs

have made no allegations whatsoever as to how the THL Defendants' 'unfettered access' would have led them across particular documents in which the red flags would have been apparent, and these allegations must therefore fail [because] there is no allegation supporting a 'strong inference' that the defendants were actually aware of the red flags in question."); *In re Priceline.Com Inc. Securities Litig.*, 342 F. Supp. 2d 33, 56 (D. Conn. 2004) ("Even if the court could infer that [auditor] was aware of the [nine] red flags set forth herein, which is no small leap, the red flags are not so egregious as to render [auditor's] audit a farce"); *Zucker v. Sasaki*, 963 F. Supp. 301, 309 (S.D.N.Y. 1997) (allegations of fraud by accountant insufficient where claim that it "knew or recklessly disregarded adverse facts" based solely on status as auditor); *and Cohen v. Franchara Corp.*, 478 F.2d 115, 123 (2d Cir. 1973) ("It is not enough for plaintiff to show that defendant failed to detect certain material facts when [it] had no reason to suspect their existence.").

Accordingly, only those red flags that PWC is alleged to have known of, or that are so obvious that PWC must have known of them, can support an inference of intent. *See The Limited v. McCrory Corp.*, 683 F. Supp. 387, 395 (S.D.N.Y. 1988) (dismissing aspect of fraud claim against independent auditor for which "factual allegations tending to establish knowledge" were lacking, but not aspect of claim where auditor was alleged to have "been apprised of the details of an event" constituting a red flag)).  Judge Lynch's summary of the inquiry in *Refco* is apt here: "there was certainly a monster under the bed; the question is whether anyone had a reason to look there."  *In re Refco, Inc. Securities Litigation,* 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007).

The complaint alleges that there were seven red flags regarding the Madoff operation: (1) operational risk was at a high level, in part because Madoff was both trader and custodian; (2) BMIS' transactions were at variance with market evidence; (3) BMIS did not permit access to its computers, and many of its reported trades could not have actually taken place at the prices reported; (4) there were position and cash breaks between Greenwich Sentry's records and BMIS' records; (5) BMIS forewent potential revenue by not engaging in securities lending or taking out commercial bank loans in order to re-invest in itself;[21] (6) BMIS reported incredibly consistent success; and (7) BMIS' independent auditor, Friehling and Horowitz, was small, not well known, and not properly certified.

The Complaint does not allege whether or how PWC acquired knowledge of most of these red flags.  In one section, the Complaint describes a number of general red flags surrounding the Madoff scheme, and in another it sets forth conclusory allegations regarding PWC's failure to investigate BMIS and to follow up on the red flags.  Aside from the allegation at the outset of the section describing the red flags that they "required Citco and PWC respectively to investigate and resolve under their respective duties, responsibilities and representations of the others' duties to Plaintiff, but neither did [sic]," (Cl. ¶ 134), and indirect conclusory references to "red flags for auditors to consider that PWC knew and/or consciously avoided knowing were present," (Cl. ¶ 205(o)), and "red flags which PWC knew, should have known and/or consciously avoided knowing were present," (Cl. ¶ 266(m)), PWC is not plausibly alleged to have had knowledge of specific red flags.  Granted, the complaint alleges facts sufficient to support the conclusion that

---

[21] The complaint treats these two decisions to forego revenue as independent red flags.  The Court groups them for the sake of clarity.

certain suspicious facts surrounded Madoff's operation, but the complaint does not connect those red flags to PWC through factually sufficient allegations that PWC actually knew of or uncovered them.

Two of the alleged red flags are such that PWC "must have" known of them. First, PWC had to be aware that BMIS consistently reported excellent results, as the statements it audited reflected that.  However, even in the present economic climate the Court is unwilling to hold that success in securities trading is a red flag.  Second, PWC must have known that Madoff was both broker and custodian of the accounts because that fact was a basic aspect of the Greenwich Sentry's operation and was explained at the outset of the PPM.  (*See* Greenwich Sentry PPM at 2, Ex. A. to Duffy Dec.)  Although the Court does see this as something of a red flag, it is far too mild to support an inference of recklessness on the part of PWC.  Particularly considering that PWC was not the auditor of BMIS, but rather of a fund that invested in BMIS, this red flag alone is insufficient to satisfy Rule 9(b)'s requirement of particularity.  Without an allegation that PWC had knowledge of further red flag(s), the Complaint does not adequately allege scienter.  Plaintiff's fraud claim against PWC is dismissed without prejudice.

### III.  CONCLUSION

For the foregoing reasons defendants' motions to dismiss, [38], [43], and [46], are granted and plaintiff's complaint is dismissed in its entirety.  Count IV, alleging fraud against PWC, is dismissed without prejudice and with leave to replead.  *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").

SO ORDERED.

Dated: New York, New York
        March 31, 2010

Richard J. Holwell
United States District Judge