UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

G. PHILIP STEPHENSON, as Trustee of the
PHILIP STEPHENSON REVOCABLE LIVING
TRUST,

                            Plaintiff,

            -against-                                09 CV 00716 (RJH)

                                            **<u>MEMORANDUM OPINION</u>**
                                               **<u>AND ORDER</u>**

PRICEWATERHOUSECOOPERS, LLP (an
Ontario limited liability partnership),

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Richard J. Holwell, District Judge:

            Defendant PricewaterhouseCoopers, LLP ("PWC") moves to dismiss plaintiff G.

Philip Stephenson's claim that PWC's fraud caused him to lose his entire investment in

Greenwich Sentry, a fund which invested in Bernard Madoff's Ponzi scheme.  For the

reasons that follow, the Court finds that Stephenson has not adequately alleged that PWC

acted with scienter and grants PWC's motion to dismiss Stephenson's fraud claim.

## BACKGROUND

            This action is one of several pending in this district arising out of Bernard

Madoff's revelation in December 2008 that his multi-billion dollar investment firm,

Bernard L. Madoff Investment Securities, LLC ("BMIS"), was a massive fraud.

            Stephenson's complaint alleges as follows.  Stephenson is trustee of the Philip

Stevenson Revocable Living Trust ("the Trust").   (Compl. ¶ 6.)  In early 2008,

Stephenson decided to invest the Trust's assets as a limited partner in Greenwich Sentry, a limited partnership organized under the laws of Delaware. (*Id.* ¶ 9, 18.)  Fairfield Greenwich (Bermuda) Ltd. ("FGB"), an investment advisor registered with the SEC whose "core product business model" was providing various management services for funds linked to BMIS, acted as general partner of Greenwich Sentry.   (*Id.* ¶ 10.)  Since Greenwich Sentry had no employees of its own, FGB was responsible for Greenwich Sentry's due diligence and risk monitoring.  (*Id.* ¶ 51.)  FGB was in turn affiliated with Fairfield Greenwich Group ("FGG"), an investment management firm that offered its investors access to BMIS through so-called "feeder funds" such as Greenwich Sentry. (*Id.* ¶ 11.)

As a "feeder fund", Greenwich Sentry invested substantially all of its limited partners' investments in an account controlled by BMIS which acted as trader, broker, and custodian of all funds and securities in the account and reported results back to Greenwich Sentry.  (Compl. ¶ 17.)  Limited partners in Greenwich Sentry could make monthly withdrawals of funds funded either from a separate Greenwich Sentry account or from BMIS itself.  (*Id.* ¶¶ 36, 38-9.)

PWC, a limited liability partnership organized under the laws of Ontario, Canada, acted as auditor for Greenwich Sentry from 2006 through 2008.  (*Id.* ¶ 7.)  PWC is a member of PricewaterhouseCoopers International ("PWC International"), a "Big Four" accounting firm which provides auditing, accounting, and other advisory services around the world.  (*Id.* ¶ 8.)  Like the other PWC International member entities, PWC held itself out as part of a unified business entity whose members utilize common knowledge bases and apply uniform policies and procedures.  For example, as part of the firm-wide "Client

Acceptance Assessment" and "Know Your Client" programs, all PWC International member firms are required to conduct research regarding the connections and/or potential conflicts of interest between new and existing clients as well as to review regulatory filings.  (*Id.* ¶¶ 70, 81.)  The data complied during these required inquiries is maintained in an automated database to which all member firms, including PWC, have access.  (*Id.* ¶ 71.)

PWC and other member firms also have access to the Global Engagement Management System in which PWC International maintains data on the relationships between firm clients and on the managers responsible for relationships with those clients. (*Id.* ¶ 72.)  Member use this database to locate employees serving related clients and exchange information with them.  (*Id.*)  Indeed, in December 2004, at the request of a PWC International member firm in Dublin, Ireland auditing a second BMIS feeder fund, a Bermuda member firm auditing a third feeder fund met with BMIS to discuss its operations "for the purpose of gaining comfort thereon for the audits by several PWC offices of a number of funds having money managed by [BMIS]."  (*Id.* ¶¶ 76-77.)  The Bermuda member firm reported the results of the meeting in a March 15, 2005 letter to the Dublin member firm and a member firm in the Netherlands that was PWC's predecessor as auditor of Greenwich Sentry.  (*Id.*)  The Netherlands member firm in turn reported the results in a letter to an entity affiliated with FGG.  (*Id.* ¶ 76.)  This letter remained in PWC International automated files accessible to PWC.  (*Id.* ¶ 78.)

PWC International member firms also hold themselves out as part of a firm with particular expertise in hedge funds and investment vehicles.  PWC organized an Alternative Investment Funds Practice devoted to auditing hedge funds (*id.* ¶ 74), and

PWC and its employees have been involved in developing industry standards for and guides to alternative investment auditing.  (*Id.* ¶¶ 55-56.)  PWC also audited seven other FGG feeder funds and assigned the same team auditing Greenwich Sentry to audit those funds as well.  (*Id.* ¶ 44.)

PWC conducted an annual audit of Greenwich Sentry.  For purposes of that audit, and the audit of other BMIS feeder funds, PWC developed an "Audit Plan."  (Compl. ¶ 65.)  The 2008 Audit Plan proposed that PWC would conduct "discussion and enquiry with [BMIS]" and "obtain an understanding of the key control activities as they relate to the operations, sub-custodian and prime broker functions."  (*Id.*)  The Audit Plan also indicated that PWC would "perform transaction testing on the investment strategy applied by [BMIS] for the applicable funds."  (*Id.*)  And the Audit Plan recognized the need to "confirm existence of investments" with BMIS and derivative contracts associated with BMIS's investment strategy, a completely automated system called the "the split strike conversion strategy" ("SSC Strategy").  (*Id.*)  In general terms, that strategy consisted of the purchase of a basket of securities corresponding to stocks in the S&P 100 Index as well as options to hedge the risk of those securities. (*See id.* ¶ 42.)

On February 20, 2008, after expressing interest in Greenwich Sentry, Stephenson received documents about one of Greenwich Sentry's sister funds, Fairfield Sentry. (Compl. ¶ 18.)  He was told that analogous documents for Greenwich Sentry were not yet available but that he could expect them to be similar and that they would be audited by a PWC International member firm.  (*Id.*)  These documents included a "due diligence questionnaire" that described protections in FGG funds, including the role played by PWC.  (*Id.*)  One week later, Stephenson received profit analyses for Fairfield Sentry

which he was told by FGG would be representative of results he could expect as a limited partner in Greenwich Sentry. (*Id.* ¶ 19.)

In March 2008, Stephenson received the Greenwich Sentry Limited Partnership Agreement and fund reports showing that Greenwich Sentry earned profits of just under one percent as compared to a multi-percentage point fall in the Down Jones Industrial Average ("DJIA"). (Compl. ¶ 20.) Stephenson also received the Greenwich Sentry PPM which described the SSC Strategy and explained that the Strategy was "implemented by [BMIS] . . . through accounts maintained by the Partnership at that firm." (*Id.* ¶¶ 20, 42.) Stephenson understood that PWC had approved some or all of these documents and would be serving as auditor for Greenwich Sentry. (*Id.* ¶ 21 (ellipsis in original).) That was critical for Stephenson as an experienced investor who knew the value of strong risk management: he specifically asked FGG whether PWC had identified any issues with Greenwich Sentry and never would have invested in the fund if PWC or a firm of equal repute was not auditing the fund. (*Id.* ¶¶ 22-24.) For its part, PWC understood that its auditing work would be relied upon by potential investors and limited partners such as Stephenson, particularly because there was no public market for Greenwich Sentry partnership interests that would facilitate public information regarding the fund. (*Id.* ¶¶ 85-86.)

On April 1, 2008, Stephenson executed a subscription agreement in his individual capacity and deposited $60 million in Greenwich Sentry accounts. (Compl. ¶ 27.) On May 1, 2008, Stephenson requested transfer of his account to the Trust. (*Id.*) Around this time, Stephenson received the 2006 and 2007 Greenwich Sentry financial statements in which PWC delivered unqualified audit opinions affirming that the statements were

prepared in accordance with Generally Accepted Accounting Practices ("GAAP") and Generally Accepted Accounting Standards ("GAAS").  (*Id.* ¶¶ 84-89.)  After receiving those opinions, Stephenson executed a new subscription agreement in his capacity as trustee on June 1, 2008 and transferred his limited partnership interest to the Trust.  (*Id.* ¶ 28.)

At first, the Trust's investment appeared to be paying off.  By October 31, 2008, Citco Fund Services (Europe) BV and Citco (Canada) Inc., the fund administrator and sub-administrator respectively, had reported that Stephenson's original $60 million investment was worth $62,540,565.  (Compl. ¶ 32.)  And by the end of November 2008, the same investment had realized a 6.59% gain at a time when the DJIA experienced losses many times that percentage.  (*Id.* ¶ 33.)  Of course, as the world now knows, those gains were illusory and Madoff needed money from investors like Stephenson to pay those prescient few who cashed out before the truth came out.   Indeed, on December 11, 2008, when Madoff revealed his fraud, Greenwich Sentry refused to withdraw Stephenson's investment and he has still never recovered a cent of his $60 million.  (*Id.* ¶ 40.)

On January 26, 2009, Stephenson filed suit [1] against Citco Europe, Citco Canada, their parent Citco Group Limited (collectively "Citco"), and PWC alleging claims under New York law for breach of fiduciary duty against Citco and for gross negligence and breach of contract against Citco and PWC.  On June 29, 2009, Stephenson filed an amended complaint [36] which he corrected [37] on July 2, 2009. The amended complaint alleged seven claims under New York law: breach of fiduciary duty and gross negligence against Citco, professional malpractice and fraud against

PWC, and breach of contract and aiding and abetting fiduciary duty against both Citco and PWC.   Stephenson's fraud claim alleged that Greenwich Sentry's financial statements were *not* prepared in accordance with GAAP and GAAS and that PWC's unqualified opinion to the contrary was false.

In a memorandum opinion and order dated March 31, 2010, the Court dismissed Stephenson's complaint in its entirety.  *See Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599 (S.D.N.Y. 2010) ("*Stephenson I*").  The Court held that Stephenson's contract, fiduciary duty, and aiding and abetting claims were derivative, *see id.* at 610-611, and could not be brought by Stephenson directly and that his fiduciary duty, gross negligence, professional malpractice, and aiding and abetting claims were preempted by the Martin Act.  *See id.* at 618.  The Court dismissed these claims with prejudice.  *See id.* at 624.

The Court dismissed Stephenson's fraud claim on the ground that the complaint failed to allege that PWC acted with scienter.  Applying the well-settled law of this Circuit, the Court held that alleged GAAP or GAAS violations do not establish scienter of their own force.  *See id.* at 621.  Though Stephenson also alleged that certain "red flags" should have put PWC on notice that there were control problems at Greenwich Sentry and that BMIS was a fraud, the Court held that the complaint did not allege that PWC had knowledge of these red flags.  *See id.* at 624.  And while PWC surely knew of BMIS's incredible success and that Madoff acted as trader, broker, and custodian, the Court found that these did not give rise to the required "strong inference" of fraudulent intent.  *See id.*  However, the Court dismissed the fraud claim without prejudice and granted Stephenson leave to amend his complaint. *See id.*

7

Stephenson filed the Second Amended Complaint (the "SAC") on June 18, 2010. Like the prior complaint, the SAC alleges that "PWC performed its audit recklessly by failing to adhere to its GAAS requirements, failing to discover the risks and failures at [Greenwich Sentry], or at or from BMIS impacting upon [Greenwich Sentry], and/or failing to report on those risks and failures or qualifying or withdrawing its Unqualified Opinion." (Compl. ¶ 94.)  In particular, the SAC alleges that PWC's audit of Greenwich Sentry violated GAAP and GAAS and PWC's own best practices in five ways.

First, the SAC alleges that GAAS required PWC to investigate Greenwich Sentry's internal controls but that PWC did not take any meaningful steps to verify Greenwich Sentry and FGG's representations that it had conducted due diligence and implemented risk control mechanisms. (*See* Compl. ¶¶ 95-128.)

Second, the SAC alleges that, because Greenwich Sentry invested substantially all of its assets with BMIS, GAAS required PWC to investigate and test the internal controls at BMIS.  The SAC alleges that PWC either never did so or recklessly ignored the results of any investigation or tests it did conduct. (*See id.* ¶¶ 129-146.)

Third, the SAC alleges that GAAS required PWC to investigate the representations and reliability of BMIS's largely unknown auditor, Friehling and Horowitz ("F&H"), but that PWC either never did so or recklessly analyzed any documentation it received from F&H.  The SAC alleges that, had PWC properly tested F&H, PWC would have known that information that it relied on F&H to provide could not form the basis of an unqualified opinion. (*See id.* ¶¶ 147-154.)

Fourth, the SAC alleges that, given the risks of fraud or misstatement presented by the lack of controls at Greenwich Sentry and BMIS, as well as by F&H's inadequate

auditing, GAAS required PWC to independently verify BMIS assets, including option contracts necessary to the SSC Strategy.  The SAC alleges that PWC never did so or recklessly ignored the results of any verification it did undertake.  (*See id.* ¶¶ 155-177.)

Fifth, the SAC alleges that GAAS mandated PWC to require Greenwich Sentry to disclose that FGG was not performing the due diligence and risk management services for which it was earning fees.  The SAC alleges that PWC did not do so and that the Greenwich Sentry financial statements never disclosed as much.  (*See id.* ¶¶ 178-183.)

In addition to GAAP violations, the SAC, like the prior complaint, also describes a number of red flags "which would place a reasonable auditor on notice that BMIS was engaging in fraud" such that offering an unqualified opinion was reckless.  (Compl. ¶ 184.)  Like the prior complaint, the SAC alleges that centralizing management, trading, and reporting functions for Greenwich Sentry with BMIS, which lacked proper controls or a certified auditor, "constituted a red flag of the likelihood of fraud involving [Greenwich Sentry] and BMIS."  (*Id.* ¶ 195).

The SAC alleges another red flag alleged in the prior complaint:  that BMIS' extraordinary returns should have placed PWC on notice that those returns were illusory.  (*Id.* ¶ 225.)  However, the SAC pleads this red flag slightly differently than the prior complaint did.  The SAC alleges that the combination of three factors constituted a red flag: (1) BMIS' outsized returns and the fact that its funds reported gains in 95% of the months in which they were operating (*id.* ¶ 226); (2) BMIS purported to have achieved these results despite a risk level that was as extraordinarily low as its returns were extraordinarily high (*id.* ¶ 228); and (3) BMIS was "out of the market" at the end of every month even when it would have been profitable to be in the market if BMIS was really

employing the automated SSC Strategy (*id.* at ¶ 231).  The SAC alleges that, taken together, these factors should have put PWC on notice that BMIS' trading strategy was a fraud and that BMIS was "out of the market" at the end of each month to avoid SEC reporting requirements.

The SAC also alleges five new red flags.  The SAC alleges that "PWC had either actual knowledge of the facts contained in the Red Flags . . . or the Red Flags were so obvious that PWC must have been aware of them if it had conducted any audit at all." (Compl. ¶ 185.)

First, the SAC alleges that BMIS reported asset values for "feeder funds" audited by PWC and other PWC International member firms that in the aggregate exceeded the value of the total assets under BMIS management that BMIS reported to the SEC. (*See id.* ¶¶ 199-215.)

Second, the SAC alleges that, given the large size of BMIS assets under management, the fact that BMIS purported to enter and exit the market *en masse* was a red flag of fraud because trading such a large portion of the market capitalization of major stocks would have caused market volatility that never in fact materialized.  (*See id.* ¶¶ 216-224.)

The third and fourth new red flags relate to the SSC Strategy's use of options to hedge its equity positions.  Though BMIS claimed that it used private counterparties to place its own hedges through the "over-the-counter" or OTC market, these counterparties would have utilized the public options market to place their own exchanges.  (*Id.* ¶ 241.) The SAC alleges that, because BMIS had such a high volume of assets under management and purported to move all of those assets at the same time, BMIS could not

have been hedging its positions because the OTC market could not have supported the volume required to do so.  (*See id.* ¶¶ 240-252.)  And the SAC further alleges that because no counterparties could have supported their own positions in the public options market, no such counterparties existed.  (*See id.* ¶¶ 253-266.)

Finally, the SAC alleges a composite red flag that there were red flags at all three stages of BMIS's purported strategy:  BMIS purported to trade in volumes that would have caused market distortion that never occurred; BMIS purported to utilize options in volumes that the market did not support; and BMIS purported to place its options with counterparties even though no counterparty could obtain options in volumes sufficient to hedge its own risk.  The SAC alleges that "even if any one individual stage of risk did not, standing alone, signal a red flag to PWC, the ***combination*** of risks and anomalies presented by all three supposed stages of the strategy suffice to create a red flag that BMIS's purported strategy was a house of cards, and that it must be operating a fraud." (Compl. ¶ 268 (emphasis in original).)

On August 20, 2010, PWC moved [62] to dismiss the SAC.

## LEGAL STANDARDS

Whether Stephenson has adequately pled a claim for fraud is governed by Federal Rules of Civil Procedure 8(a)(2) and 9(b), the latter of which requires plaintiffs to plead fraud claims with particularity.

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v.*

*Gibson*, 355 U.S. 41 (1957) (abrogated in part by *Twombly*)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  The requirement of "factual matter" means that "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 1949.  Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  If the factual averments permit no reasonable inference stronger than the "mere possibility of misconduct," the complaint should be dismissed.  *Starr v. Sony BMG Music Entn't*, 592 F.3d 314, 321 (2d Cir. 2010).

Since Stephenson alleges fraud, the Court must scrutinize his claim even further because Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead fraud with particularity.  Fed. R. Civ. P. 9(b).  Under that rule, long-standing case law in this Circuit requires plaintiffs to "allege facts that give rise to a strong inference of fraudulent intent."  *Actio v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).  "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

In addition, "there are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others." *Novaks v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).[1]  Thus "[t]he standard for pleading auditor scienter is demanding." *In*

---

[1]     The Court's analysis here and below of cases alleging fraud under the federal securities laws in analyzing a common law fraud claim merits some discussion. Prior to the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007), the Court might have cited federal securities cases with a much shorter footnote because the "strong inference" requirement was an interpretation of Federal Rule of Civil Procedure 9(b).  That requirement therefore applied to all cases sounding in fraud whether they arose under federal or state law.

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA").  A provision of the PSLRA required plaintiffs alleging fraud under the federal securities laws to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In enacting that provision, Congress sought to impose "a uniform standard modeled upon the pleading standard of the Second Circuit."  S. Rep. No. 104-98, at 15 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694.  Thus, even after the PSLRA, cases arising under the federal securities laws were relevant to adjudicating common law fraud claims.  Indeed, "the PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher . . . ." *Novaks v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000).

In *Tellabs*, however, the Supreme Court interpreted "strong inference" in a manner that went beyond Second Circuit precedent interpreting Rule 9(b).  The Supreme Court held that a strong inference "must be cogent and at least as compelling as any opposing inference of nonfradulent intent" and that testing allegations against that standard requires a court to "engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314.  That decision raises a question as to whether a Court should consider post-*Tellabs* federal securities fraud decisions in common law fraud cases because the PSLRA explicitly applies only to fraud actions under the federal securities laws and the "[t]he Second Circuit has not defined what constitutes a 'strong inference' in the common law fraud context with the level of detail that the Supreme Court used in *Tellabs*." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 451 n.5 (S.D.N.Y. 2007).

Nevertheless, several courts in this Circuit considering fraud claims after *Telllabs* appear to have treated the *Tellabs* framework as relevant and post-*Telllabs* cases as persuasive authority in considering common law fraud claims.  *See, e.g.*, *Bay Harbour Mgmt. LLC v. Carothers*, 282 Fed. Appx. 71, 77 (2d Cir. 2008) (after analyzing plaintiff's federal securities claims under the *Tellabs* framework, holding that "[f]or the same reasons set forth above, [plaintiffs] have failed to plead facts, with the particularity required by Federal Rule of Civil Procedure 9(b), that could give rise to a claim for common law fraud"); *Allianz Risk Transfer v. Paramount Pictures Corp.*, No. 08-CV-

*re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008). "For 'recklessness on the part of a non-fiduciary accountant' to satisfy securities fraud scienter, 'such recklessness must be conduct that is highly unreasonable, representing 'an extreme departure from the standards of ordinary care.' It must in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.'" *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (quoting *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120-121 (2d Cir. 1982)). Indeed, the complaint must allege "an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007). *See also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007).

Under this "demanding" standard, "failures to comply with Generally Accepted Accounting Practices or other such irregularities are insufficient to establish

---

10420, 2010 WL 1253957, at *9 (S.D.N.Y. Mar. 31, 2010) ("As to pleading requirements, although a common law fraud claim is subject to Fed. R. Civ. P. 9(b) rather than the PSLRA, there is no significant distinction between the two as practiced in the Second Circuit."); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 651 F. Supp. 2d 155, 171 (S.D.N.Y. 2009) (reciting *Tellabs* framework in considering common law fraud claim); *Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 29 (S.D.N.Y. 2009) (finding federal case-law "persuasive" and applying it to common law fraud claim) (citing *Glidepath*, 590 F. Supp. 2d at 451 & n.5 (("[T]he Supreme Court's guidance in how to interpret inferences extended beyond the specific context of the PSLRA.")). *But see SEC v. Dunn*, 587 F. Supp. 2d 486, 502 (S.D.N.Y. 2008) ("Defendants cite two decisions from this District for the proposition that the *Tellabs* PSLRA "strong inference" test should apply in the broader Rule 9(b) context, but neither is persuasive.").

And as with the previous motion to dismiss, the parties appear to have no problem with that approach: they both have nearly exclusively cited federal securities cases and have argued that the "most compelling inference" is either that PWC effectively assisted in the fraud or was a fellow victim of it. Accordingly, the Court will treat post-*Tellabs* cases as relevant to considering Stephenson's common law fraud claim.

recklessness." *W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 Fed. Appx. 717, 720 (2d Cir. 2009). *See also Novaks*, 216 F.3d at 309 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 450 (S.D.N.Y. 2010) ("Violations of professional auditing standards, without more, do not constitute strong circumstantial evidence of conscious recklessness."); *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 239 (S.D.N.Y. 2004) ("[A]llegations of GAAP and GAAS violations are not sufficient, on their own, to establish scienter."). Likewise, "[i]n the accounting context, failure 'to identify problems with the defendant company's internal controls and accounting practices does not constitute recklessness.'" *Doral Fin. Corp.*, 344 Fed. Appx. at 720 (quoting *Novaks*, 216 F.3d at 309); *see also Decker*, 681 F.2d at 120-121. "To rise to the state of mind required, these allegations must be coupled with evidence of 'corresponding fraudulent intent.'" *Doral Fin. Corp.*, 344 Fed. Appx. at 720 (*quoting Novaks*, 216 F.3d at 309). *See also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) (same).

"A complaint might reach the 'no audit at all' threshold by alleging that the auditor disregarded specific 'red flags' that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re Tremont Sec. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 370 (S.D.N.Y. 2010). Indeed, "[a]llegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter." *In re AOL Time Warner*, 381 F. Supp. 2d at 240.

But an unseen red flag cannot be heeded.  Hence courts in this Circuit have consistently dismissed fraud claims against auditors—including against auditors of BMIS feeder funds—that have not sufficiently alleged that an auditor knew of red flags.  *See In re Beacon Assoc. Litig.*, No. 09-CV-777, 2010 WL 3895582, at *22 (S.D.N.Y. Oct. 5, 2010) ("Plaintiffs allege a litany of red flags, but fail to allege sufficiently that Friedburg ever became aware of them . . . . Such allegations do not support a strong inference that Friedburg was aware of red flags and acted with scienter."); *Anwar*, 728 F. Supp. 2d at 453 (dismissing claim that "d[id] not allege that the PwC Member Firms . . . were aware of sufficient information as auditors to satisfy the heightened pleading required"); *In re Tremont*, 703 F. Supp. 2d at 371 (same where plaintiffs "d[id] not allege that the Auditors were aware of any facts indicative of Madoff's fraud"); *see also In re Scottish Re*, 524 F. Supp. 2d at 398  ("At best, plaintiffs have alleged that a reasonable auditor would have discovered the problems with the Company's valuation of the deferred tax assets and internal controls.").

And only in a select few cases have courts in this Circuit found that, "because the red flags would be clearly evident to any auditor performing its duties, one could reasonably conclude that [the auditor] must have noticed the red flags, but deliberately chose to disregard them . . . ." *In re Philip Serv. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004) (quotation marks omitted).  *See also In re Complete Mgmt. Inc. Sec. Litig.*, 153 F.2d 314, 334 (S.D.N.Y. 2001) ("Here, plaintiffs make the critical allegation that if Andersen were conducting any kind of audit at all, they would have seen the potential problems with the [audited company's] receivables and the need to investigate further."); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y.

1999) (denying motion to dismiss where complaint alleged that, based on investigatory finding that a company's "computer accounting system was unable to keep track of basic information", state regulatory agency had mandated that "the leaders of the KPMG auditing team be removed" and yet KPMG reaffirmed the accuracy of its audit).

Nor is it enough to "merely alleg[e] that the auditor had access to the information by which it could have discovered the fraud . . . ." *In re Tremont*, 703 F. Supp. at 370; *see also Rothman*, 220 F.3d at 98; *In re IMAX*, 587 F. Supp. at 484. Thus the Second Circuit has affirmed the dismissal of a complaint "replete with allegations that [a firm] 'would' have learned the truth as to those aspects of the [fraudulent] funds if [it] had performed the 'due diligence' it promised" and that "[i]f [the firm] had asked various questions earlier, it would have further questioned the [fraudulent fund's] financial records or recognized the need to ask further questions." *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 112 (2d Cir. 2009). *See also Massey-Ferguson Ltd.*, 681 F.2d at 120 ("Plaintiff's allegation that [an accounting firm] reviewed or recklessly failed to review data and documents relating in part to . . . the adequacy of [a company's] internal controls and accounting . . . when properly parsed, contains no allegation of actionable fraudulent conduct.") (internal quotation marks omitted); *In re Refco*, 503 F. Supp. 2d at 663 (dismissing claim where "plaintiffs have made no allegations whatsoever as to how the [defendants'] 'unfettered access' would have led them across particular documents in which the red flags would have been apparent"). Judge Lynch's formulation is as apt here as it was in the Court's prior order: even if "there was certainly a monster under the bed", for the Court "the question is whether anyone had a reason to look there." *Id.* at 649.

A defendant has reason to look where it is aware of red flags, but flags are not red merely because the plaintiff calls them red.  *See In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 487 (S.D.N.Y. 2006) ("Merely labeling allegations as red flags . . . is insufficient to make those allegations relevant to a defendant's scienter.") Indeed, "plaintiffs must allege that facts which come to a defendant's attention would place a reasonable party in defendant's position on notice of wrongdoing."  *In re Refco*, 503 F. Supp. 2d at 649 (quotation marks omitted).  Where plaintiffs have alleged that a defendant was aware of such facts, courts in this Circuit have allowed such actions to proceed.  *See, e.g.*, *In re Complete Mgmt.*, 153 F.2d at 334-35; *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 610 (S.D.N.Y. 2009) ("Plaintiffs do not merely allege that HB & M should have discovered errors in [the audited company's] financial reporting, but that they were aware, based on [the audited company's] filings, that there were ongoing serious problems with the [the audited company's] financial reporting."); *In re Winstar Commc'ns*, Nos. 01-CV-3014, 01-CV-11522, 2006 WL 473885, at \*11 (S.D.N.Y. Feb. 27, 2006) (holding that allegations that an audited company provided auditor "with all the paperwork associated with the claimed bogus transactions . . . . also gives rise to a strong inference that [the auditor] acted recklessly in conducting the [company's] audit").

## DISCUSSION

In order to survive a motion to dismiss, the SAC must "allege facts that give rise to a strong inference of fraudulent intent."  *Actio*, 47 F.3d at 52.  A strong inference would arise if the SAC alleges either that PWC had a motive and opportunity to commit fraud or otherwise "alleg[es] facts that constitute strong circumstantial evidence of

18

conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128.  Since the SAC does

not identify any motive that the Court has not already identified as insufficient in its prior

order, *see Stephenson I*, 700 F. Supp. 2d at 620-21, the question is whether the SAC

"alleg[es] facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness." *Id.*

The five GAAS violations alleged by the SAC are not such facts.  It is well-

established that "allegations of GAAP and GAAS violations are not sufficient, on their

own, to establish scienter."  *In re AOL Time Warner*, 381 F. Supp. 2d at 239; *see also*

*Anwar*, 728 F. Supp. 2d at 450.   Nor are the allegations that PWC ignored a lack of

controls at Greenwich Sentry and BMIS sufficient to establish scienter.  *See Doral Fin.*

*Corp.*, 344 Fed. Appx. at 720.  The SAC's conclusory allegations that the failures were

reckless do not make them so.  Rather, "these allegations must be coupled with evidence

of 'corresponding fraudulent intent.'" *Doral Fin. Corp.*, 344 Fed. Appx. at 720 (*quoting*

*Novaks*, 216 F.3d at 309).  Indeed, Stephenson seems to concede as much. (*See* Pl.'s

Opp'n at 2 (""[A]llegations of GAAS violations, ***coupled with*** wil[l]ful or reckless

ignorance of red flags of misconduct, supply the requisite inference of 'fraudulent intent'

for pleading purposes."); *see also id.* at 3.)

However, none of the seven red flags alleged in the SAC supplies the required

"strong inference" of fraudulent intent.  Most of these red flags allege no more than that

PWC had access to information by which it *could* have discovered warning signs of fraud

or that PWC *would* have discovered these warnings signs if it had conducted an audit in

accordance with GAAS and its own policies.  Perhaps that is true, though even that

suggestion seems questionable since numerous other entities had access to the same

19

information and none of them discovered Madoff's fraud before he revealed it.  But, in any event, the SAC does not allege facts from which the court could infer that PWC actually knew about and ignored most of these warning signs.  And the two red flags which PWC did seem to know do not appear to have put PWC on notice of a fraud. Therefore, like at least four other courts who have considered similar suits against auditors of BMIS feeder funds, *see In re Beacon Assoc.*, 2010 WL 3895582, at *22; *Anwar*, 728 F. Supp. 2d at 453; *In re Tremont*, 703 F. Supp. 2d at 371, *CRT Inv., Ltd. v. Merkin*, 2010 WL 434033 (N.Y. Sup. Ct. N.Y. County May 5, 2010), the Court concludes that Stephenson has not pleaded facts suggesting "an actual intent to aid in the fraud being perpetrated by" BMIS.  *Rothman*, 220 F.3d at 98.  The Court now assesses each red flag in more detail.

The first red flag alleged is that "there were no verifiable controls over BMIS", "BMIS had exclusive control of the management of [Greenwich Sentry] funds, was the sole executing broker for trades involving [Greenwich Sentry] funds and for the [Greenwich Sentry] trading strategy; and was the sole custodian of [Greenwich Sentry] funds" as well as "the sole source of information for [Greenwich Sentry] trades and asset values."  (Compl. ¶ 193.)  The SAC alleges that PWC knew these facts because they were disclosed in Greenwich Sentry's public documentation.  (*Id.* ¶ 194.)  However, the Court has already held that this alleged warning sign "is far too mild to support an inference of recklessness on the part of PWC."  *Stephenson I*, 700 F. Supp. 2d at 624.  Another Court has since adopted that view.  *See Anwar*, 728 F. Supp. 2d at 453 ("Plaintiffs further claim as a red flag that 'all of the Funds' assets were managed by Madoff, who acted as investment advisor, broker-dealer, and custodian of those assets—a highly unusual

arrangement with no checks and balances.' The Court is not persuaded that the auditors'

alleged ignoring of this warning sign supports an inference of conscious recklessness

against them.") (internal citations omitted).

Stephenson argues that PWC's reliance on *Anwar* is bootstrapping because that

decision cited the Court's prior ruling and the SAC "newly pleads in detail the

significance of the operational risk at BMIS for the financial statements of [Greenwich

Sentry], which is of sufficient significance to an auditor's task that it must have been

obvious in the course of a proper audit." (Pl.'s Opp'n at 9-10.)  The Court is not

persuaded.  The SAC's new allegations are largely general statements about the

importance of "operational risk" to an auditor.  True, the SAC alleges that operational

risk is "heightened where [an auditor] knows that the audit client has not arranged for, or

is not performing, due diligence and ongoing risk monitoring and oversight" and "the

actual auditor for such third party or service organization is known by the auditor of the

client to be an inadequate protection against detecting and identifying the operational risk

. . . ."  (Compl. ¶¶ 188-89.)  But this is itself bootstrapping:  the former claim essentially

repeats the insufficient allegation that PWC failed to investigate internal controls; the

latter claim essentially repeats the conclusory and insufficient allegation that PWC knew

that F&H was not a certified or reputable auditor.  *See Stephenson I*, 700 F. Supp. 2d at

624.

The second red flag alleged is that BMIS reported asset values for "feeder funds"

that in the aggregate exceeded the value of the total assets under BMIS management that

BMIS reported to the SEC.  The SAC alleges that PWC knew of this variance because (a)

"PWC Int'l member firms with BMIS feeder fund clients shared information with other

PWC Int'l member firms" and (b) PWC was "required by its Client Acceptance [a]nd Continuance Policies, its general audit methodology, its audit plan for [Greenwich Sentry], and/or the Practice Aid to obtain and review regulatory filings in general" and BMIS's filings with the SEC "in particular." (Compl. ¶¶ 200, 204.) These are no more than allegations that PWC had access to information that would have revealed a variance in BMIS's reported assets or that PWC would have discovered such a variance if it had done what it had promised. Such allegations are insufficient to establish that PWC actually knew of the variance. *See In re Tremont*, 703 F. Supp. at 370 ("merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient."); *see also Rothman*, 220 F.3d at 98; *In re IMAX*, 587 F. Supp. at 484; *CRT Inv. Ltd*, 2010 WL 4340433, at *13 ("Plaintiffs are merely alleging that BDO Seidman had access to the information by which it could have discovered Madoff's fraud. This is insufficient.").

Stephenson argues that the SAC does not allege "mere 'access'" but instead alleges that PWC "had this information in its own databases by virtue of the design of procedures which it and its sister firms employed to make sure that each PWC member firm knew such information" and PWC "is presumed and alleged to have actual knowledge of information within its own control and custody . . . at this stage of the proceedings." (Pl.'s Opp. at 12-13.) But Stephenson cites no case for the proposition that one member of a global firm can be charged with actual knowledge of all information in the global firm's database and the Court is aware of none. Stephenson has "made no allegations whatsoever as to how [PWC's] 'unfettered access' would have led them across particular documents in which the red flags would have been apparent." *In*

*re Refco*, 503 F. Supp. 2d at 663.  Moreover, saying that PWC could have known about any valuation variance by aggregating a variety of sources, none of which actually documented the variance, is not the same as saying that PWC actually knew of the variance.   The missing link is that PWC had to actually perform the aggregation.  The SAC alleges that PWC promised to do that, but it is not enough to allege that PWC "'would' have learned the truth as to those aspects of the [fraudulent] funds if [it] had performed the 'due diligence' it promised." *South Cherry Street*, 573 F.3d at 112; *see also Anwar*, 728 F. Supp. 2d at 453 (same).

 The third red flag alleged is that BMIS' unmatched returns should have placed PWC on notice that those returns were illusory.[2]  In its prior order, the Court recognized that "PWC had to be aware that BMIS consistently reported excellent results, as the statements it audited reflected that" but the Court was "unwilling to hold that success in securities trading is a red flag." *Stephenson I*, 700 F. Supp. 2d at 624.  The Court remains unwilling to do so.  *Cf. Novak*, 216 F.3d at 309 ("[T]he failure . . . to interpret extraordinarily positive performance . . . as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws."); *Chill*, 101 F.3d at 270 ("The fact that GE did not automatically equate record profits with misconduct cannot be said to be reckless.").  Stephenson was "similarly likely aware of Madoff's exceptional returns and made [his] investment in Madoff precisely because of his consistent, positive results—not because of any conscious recklessness." *Anwar*, 728 F. Supp. 2d at 452.

---

[2] The complaint labels this "Red Flag #4" but the Court considers it here for the sake of clarity.

Of course, the SAC alleges not only that BMIS earned inexplicable returns, but that it purported to do so at an inexplicably low risk and by exiting the market on quarter-ending days when the SSC Strategy indicated that remaining in the market would have been profitable.  And several courts in this Circuit have found known suspicious quarter-end transactions to be red flags of fraud.  *See, e.g.*, *In re Refco*, 503 F. Supp. 2d at 658-59; *In re Winstar*, 2006 WL 473885, at *11-12; *In re AOL Time Warner*, 381 F. Supp. 2d at 240; *see also In re Homestore.com Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1044 (C.D. Cal. 2003), *vacated on other grounds by* 519 F.3d 1041 (9th Cir. 2008).  But the SAC merely offers the conclusory allegations that "PWC knew" that "Fairfield Sentry reported that the [Split-Strike Conversion strategy] was implemented four times in 2006, each time lasting more than two months" and that "the only apparent explanation for the [Split-Strike Conversion strategy] to be in the market for nearly all of 2006 except for those dates is the desire of BMIS to avoid triggering a reporting requirement of the SEC to file Form 13-F as to actual holdings as of those dates."  (Compl. ¶¶ 233-34.)  The SAC does not contain any allegation that PWC knew or had seen any document showing that BMIS could have earned profits by remaining in the market on quarter-ending days when it chose to exit.  And "allegations of what the PwC Member Firms 'would have determined' had they analyzed and tested Madoff's strategy against his returns are simply insufficient because they fail to allege the firms' awareness of any problematic analysis or testing of Madoff's consistent returns."  *Anwar*, 728 F. Supp. 2d at 452-53.

The fourth red flag alleged is that BMIS could not have executed its purported strategy to enter and exit its positions *en masse* because, given the massive size of its holdings, these transactions would have caused market volatility that never in fact

occurred.   The SAC alleges that PWC knew of this red flag because PWC International

"employed market specialists" to track market activity; "PWC publicly represented" that

it analyzed investments in market context; and "PWC represented to FGG, as part of its

Audit Plan" that it would test the valuation of BMIS derivatives. (Compl. ¶ 217.)  These

allegations do not establish a strong inference that PWC knew that market data did not

reflect the transactions BMIS reported to make, for, again, "it is not enough to allege that

PWC "'would' have learned the truth as to those aspects of the [fraudulent] funds if [it]

had performed the 'due diligence' it promised." *South Cherry Street*, 573 F.3d at 112.

Rather, Stephenson's "reasoning is redolent of that rejected in *South Cherry*—had [PWC]

conducted a thorough investigation, [PWC] *would have* become aware of various red

flags." *In re Beacon Assocs.*, 2010 WL 3895582, at *22 (emphasis in original). "There

are no allegations that [PWC] was aware of any concrete facts indicating the fraud." *CRT

Inv., Ltd.*, 2010 WL 4340433, at *13.  As with the valuation variance, there is a

difference between an allegation that PWC could have aggregated the numbers from

firms that were not its client and compared them to data on the S&P 100 and an

allegation that PWC actually aggregated the numbers and compared them.  Maybe PWC

promised to do that, but the allegation that PWC never did what it promised sounds more

like a breach of contract that a fraud.  *Cf. South Cherry Street*, 573 F.3d at 115 ("At

bottom, this was a contract case.").

        For much the same reason, the SAC fails to adequately plead scienter with

respect to the fifth, sixth, and seventh red flags alleged.  These red flags relate to the

market for the options that BMIS claimed to use as part of the SSC Strategy.  The fifth

red flag alleged is that the OTC market could not support the volume of options BMIS

would have had to place in order to execute the SSC Strategy.  And the sixth red flag alleged is that counterparties to these options could not obtain options in the public market in quantities sufficient to hedge their own positions.  The SAC alleges that PWC knew of these red flags because it "ha[d] access to and follows markets via PWC Int'l's Global Capital Markets practice"; PWC "held itself out as[] an expert in auditing hedge fund management"; "PWC undertook and was required to understand the market environment"; "PWC undertook and was required to understand the rationale for significant and unusual business transactions"; "PWC, by virtue of being a globally recognized leader in auditing alternative investment funds . . . had access to unprecedented market intelligence"; "the Audit Plan for [Greenwich Sentry] required them to test BMIS's investment strategy"; and GAAS required PWC to know about counterparty trading.  (Compl. ¶¶ 249, 259.)  These, too, are no more than allegations that a GAAS violation *ipso facto* establishes scienter or that PWC "would' have learned the truth as to those aspects of the [fraudulent] funds if [it] had performed the 'due diligence' it promised."  *South Cherry Street*, 573 F.3d at 112.  These allegations do not adequately plead scienter. "At best, [Stephenson] ha[s] alleged that a reasonable auditor would have discovered the problems . . . ."  *In re Scottish Re*, 524 F. Supp. 2d at 398.

Where the SAC has failed to plead that PWC actually knew about these red flags, the SAC alleges to no avail that, "even if any one individual stage of risk did not, standing alone, signal a red flag to PWC, the ***combination*** of risks and anomalies presented by all three supposed stages of the strategy suffice to create a red flag that BMIS's purported strategy was a house of cards, and that it must be operating a fraud."  (Compl. ¶ 268 (emphasis in original).)   Several slightly red flags might make it easier to

make out a warning sign, *see, e.g.*, *In re the Leslie Fay Cos. Inc., Sec. Litig.*, 871 F. Supp.
686, 699 (S.D.N.Y. 1995) (holding that fact that auditor "ignored multiple 'red flags'
could reasonably support an inference that [the auditor] acted with intent"), but it makes
no sense to say that a defendant has seen red flags he has not seen merely because he has
not seen three of them.

The insufficiency of the SAC's red flag allegations becomes clear in comparing
the circumstances in which courts in this Circuit have sustained claims that an auditor
knew of a red flag.  Those courts have found a strong inference of recklessness where the
audited company's own filings explicitly disclosed problems with internal controls, *see*
*Varghese*, 672 F. Supp. 2d at 602, 610; where arbitration decisions had determined that
receivables certified by the auditor as revenues were uncollectable, *see In re Complete*
*Mgmt.*, 153 F. Supp. 2d at 319, 334; where the audited company "began to fall behind in
payments to PwC and PwC delayed its audit as a result", *Whalen v. Hibernia Foods PLC*,
04-CV-3182, 2005 WL 1799370, at *4 (S.D.N.Y. Aug. 1, 2005); where the auditor had
been "provided . . . with all the paperwork associated with the claimed bogus
transactions", *In re Winstar*, 2006 WL 473885, at *11; where the auditor directly
received reports of suspicious transactions or accounting irregularities, *see In re Philip*
*Serv. Corp.*, 383 F. Supp. 2d at 475; *In re Worldcom, Inc. Sec. Litig.*, No. 02-CV- 3288,
2003 WL 21488087, at *4 (S.D.N.Y. June 25, 2003); *In re Health Mgmt., Inc. Sec. Litig.*,
970 F. Supp. 192, 203 (E.D.N.Y. 1997); *Ades v. Deloitte & Touche*, 799 F. Supp. 1493,
1500 (S.D.N.Y. 1992); and where the auditor was involved in developing the accounting
policies that allegedly broke down, *see In re IMAX*, 587 F. Supp. 2d at 484 ("The feature
that distinguishes this case . . . is plaintiffs' allegation that PWC was extensively involved

27

in the process by which IMAX's revenue recognition policy developed and evolved during the class period."); *In re Winstar*, 2006 WL 473885, at *10 (denying motion to dismiss where "the complaint alleges [auditor's] active role in advising [the audited company], as well as negotiating and structuring the subject transactions.").

The SAC does not allege that PWC was actively involved in structuring BMIS's or Greenwich Sentry's transactions and does not point to any document that would have put PWC on notice of a fraud at BMIS.[3] Rather, the SAC alleges that, had PWC conducted a more thorough audit of both Greenwich Sentry and BMIS, PWC would have connected the dots and determined that BMIS—which was not its client—was a fraud. That may be a charge that PWC conducted a shoddy audit but it is not a charge that PWC shared an "intent to aid in the fraud", *Rothman*, 220 F.3d at 98. On the contrary, other PWC International member firms as well as other auditors of feeder funds were confronted with the same facts and all of them made the same decision as PWC.[4] That

_____

[3] The SAC does allege that Kingate, another BMIS feeder fund, reported to its investors that because BMIS "has actual custody of the assets" there was a risk that "information supplied by the Investment Advisor [BMIS] may be inaccurate or even fraudulent." (Compl. ¶ 80.) However, PWC was not the auditor for Kingate and the complaint's implicit allegation that PWC would have known about the letter because of its access to member firm information through a global database is insufficient for the reasons discussed above.

[4] *In re Worldcom, Inc. Securities Litigation*, No. 02-CV-3288, 2003 WL 21488087 (S.D.N.Y. June 25, 2003) is not to the contrary. In that case, the court denied Arthur Andersen's motion to dismiss where "[t]he Complaint allege[d] that Andersen had unlimited access to WorldCom's books and records and had, as WorldCom's independent auditor, an obligation to review and evaluate those records in order to form an opinion regarding WorldCom's financial statements." *Id.* at *7. The court concluded that "allegations identifying the steps Andersen should have taken and failed to take, and the fraud it would have discovered if it had taken those steps, create a strong inference that Andersen acted recklessly in conducting the WorldCom audits." *Id.* On their face, those statements could be read to describe Stephenson's claim. But given clear Second Circuit precedent that GAAP or GAAS violations alone cannot establish scienter, it makes little sense to read the court's opinion in *Worldcom* to mean that the allegation that Andersen

alone does not mean that PWC was not reckless, for it is possible that all of these firms (or PWC International as a whole) shared an "intent to aid in the fraud."  But that seems far less likely than that all of these firms were kept in the dark as much as their audit clients about Madoff's fraud.

   Nor is this a case where, "because the red flags would be clearly evident to any auditor performing its duties, one could reasonably conclude that [the auditor] must have noticed the red flags, but deliberately chose to disregard them."  *In re Philip Serv. Corp.*, 383 F. Supp. at 475.  The SAC alleges that the "facts alleged would have been obvious to an auditor performing an appropriate audit according to GAAS, unless willfully ignored." (Compl. ¶¶ 198, 215, 224, 239, 252, and 264.)   That conclusory allegation is not enough. Rather, the SAC must allege facts giving rise to a strong inference that PWC's audit was "an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."  *In re Scottish Re*, 524 F. Supp. 2d at 385.  The SAC only makes two allegations on that front:  that it is "inconceivable to think that PWC did not seek to place the huge purported volume of trading into the context of the market in which it was being performed" and that the fraudulent nature of BMIS's returns "should have been obvious to a reasonable auditor

---

failed to fulfill its obligation to evaluate WorldCom's records alone gave rise to a "strong inference" of recklessness.  Indeed, the court's opinion in that case notes that Andersen received a report identifying one of the suspicious transactions that ultimately resulted in the fraud.  *See id.* at *4.  In any event, there is no allegation here that PWC had unlimited access to BMIS records such that its failure to uncover the fraud would have been as egregious as the failure in *Worldcom*.  Indeed, the distinction makes intuitive sense where, unlike in *Worldcom* where the defendant served as auditor for the defrauding entity, PWC was the auditor for Greenwich Sentry, not BMIS itself.

charged with examining the audit client's business and financial statements." (Compl. ¶¶ 217, 235.) Neither conclusory statement can establish a strong inference of intent.

In the end, the nub of Stephenson's complaint is that PWC failed to uncover and report fraud at BMIS—a firm it was never hired to audit. The SAC alleges that, under GAAS, "PWC was required to evaluate and assess the internal controls at BMIS and to test those internal controls over the occurrence and completeness of transactions performed or reported to be performed by BMIS pertaining to [Greenwich Sentry], and over the existence of assets, liabilities and equity interests held by BMIS pertaining to [Greenwich Sentry.]" (Compl. ¶ 129.) But the allegation that PWC failed to do any of those things does not create a "strong inference" that PWC effectively had "an actual intent to aid in the fraud *by the audited company*." *Rothman*, 220 F.3d at 98 (emphasis added). Indeed, it does not quite make sense to say that the fraud occurred at Greenwich Sentry. As one court in this district has noted in rejecting claims against auditors of other BMIS feeder funds, "[t]he notion that a firm hired to audit the financial statements of one client . . . must conduct audit procedures on a third party that is not an audit client (BMIS) on whose financial statements the audit firm expresses no opinion has no basis." *In re Tremont*, 703 F. Supp. 2d at 371. *See also CRT Inv. Ltd*, 2010 WL 4340433, at *13 ("BDO Seidman . . . was not hired to audit Madoff's business, or to issue an opinion on Madoff's or BMIS's financial statements. Its only role was to audit the financial statements of [feeder funds]. There is no rational basis for inferring that BDO Seidman knowingly made misrepresentations.").

Stephenson cites no case to the contrary other than *In re Complete Mgmt. Inc. Securities Litigation*, 153 F.2d 314 (S.D.N.Y. 2001). That case involved a medical

expenses management company whose major revenue source was rights to reimbursement from insurers that had been assigned to the management company by a third party medical practice.  But the complaint in that case alleged that arbitration decisions had found the practice's reimbursement requests uncollectable, thereby rendering essentially worthless the revenues the auditor had certified.  *See id.* at 319, 334. The SAC does not allege that PWC or any other person or entity had reached such a conclusion with respect to BMIS' assets at the time at that PWC rendered its unqualified opinions.  For that reason, the SAC's complaint that PWC's opinions were knowingly fraudulent because BMIS' assets were worthless must fail.

**CONCLUSION**

For the foregoing reasons defendant's motion **[62]** to dismiss is GRANTED and plaintiff's complaint is dismissed.

SO ORDERED.

Dated: New York, New York
      March __6__, 2011

Richard J. Holwell
United States District Judge

32